The **CLEMSON UNIVERSITY VIETNAM MORATORIUM COMMITTEE by its Steering Committee Michael J. Sloan, Randall Ashley, Richard Harpootlian, Charles Whitmire, Reiv Hauplinger, Dennis Bolt, Terrance J. Clyne, and Charles Segars, Plaintiffs,**

**v.**

**CLEMSON UNIVERSITY by its President Robert C. Edwards and the Clemson University Executive Committee composed of Melford Wilson, Wright Bryant, Walter Cox, Victor Hust, and A. Wood Rigsby, and the Board of Trustees of Clemson University by Frank Jervey as representative of all Board members, all in their official capacity, Defendants.**

**Civ. A. No. 69-919**

United States District Court
D. South Carolina,
Anderson Division.
Nov. 11, 1969.

**130**

C. Rauch Wise, Greenwood, S. C., for plaintiffs.

Daniel R. McLeod, Atty. Gen., Michael W. Tighe, Asst. Atty. Gen., Columbia, S. C., and William L. Watkins, Anderson, S. C., for defendants.

## ORDER

DONALD RUSSELL, District Judge.

The plaintiffs,[1] styling themselves the Steering Committee of the Clemson University Vietnam Moratorium Committee filed this action against the President, Executive Committee and Trustees of Clemson University, seeking primarily a Temporary Restraining Order, requiring the defendants to allow the plaintiffs "to host a regional Vietnam Moratorium Day Observance" on November 13 and 14

on the campus of the University, using such facilities of the University as may be agreed upon between the Committee and the University administration. The request of the Committee for permission to "host" the proposed regional conference was submitted orally; the exact nature of the program to be had at the conference is indefinite. It is intended, however, that invitations to participate should be extended to student bodies of colleges and universities situated in Florida, Alabama, Arkansas, Georgia, North and South Carolina, and Tennessee. The number who might attend is indefinite, though it was hoped, according to the Committee, that three thousand students, outside the Clemson body, would attend. It was proposed that the real observance should extend over a twelve-hour period from twelve o'clock noon on November 14 to twelve o'clock midnight of the same day. Space and facilities for registration were desired by the Committee. In addition, there would be refreshment stands set up and booths where badges and other mementoes of the occasion would be sold. From six o'clock on there would be meetings. Some of these would be small panel discussions, for which appropriate accommodations would be required. Later, a debate or confrontation between a "dove" and a "hawk" on the Vietnam involvement would be had. The Committee, through cooperation with the National Committee for the observance of a Vietnam Moratorium Observance, would supply the "dove" and an auxiliary of the John Birch Society was expected to supply the "hawk". The National Committee had agreed to support financially the observance.

Earlier, on October 9, the local Committee of interested students, composed largely, if not wholly, of the same membership as the petitioning Committee, had applied to the University adminis-

[1.] Since this action was filed at least two of the alleged members of the plaintiff-Committee have notified the Clerk of this Court that their names had been improperly used in filing this action and have asked that their names be stricken from the list of plaintiffs. The request for the deletion of their names as parties-plaintiff was made to the counsel for the plaintiffs and it is assumed he will move the Court to honor their request.

tration for permission and facilities to hold a Vietnam Moratorium Observance among students of the University. That request was approved by the Administration and the observance was had on October 13. It seems clearly established that, during such observance, a serious condition arose. One of the members of the Committee frantically appealed to the Vice-President for Student Affairs for help, expressing the real fear that a riot was threatened. Mr. Cox, the Vice-President, promptly responded and apparently, with the assistance of a number of other University officials and the members of the University's security force, was able to prevent any substantial violence from developing, though it seems he was considerably aided by a providential rain which chilled the ardor of the more militant. A day or two later, writing in the campus paper, a member of the petitioning Committee described the dangerous condition on the night of the observance and referred to certain acts of violence that occurred at the time. There seems little doubt that the observance was marked by a very threatening situation. Both the plaintiffs and the defendants lay the blame for the threatening condition on "outsiders" (i. e., persons not then members of the Clemson student body). Mr. Rogers, who apparently was the liaison between the local and the National Committee, said that the "outsiders", who were present in sympathy with the observance, aroused the ire of a substantial number of Clemson students by their unorthodox or "hippie" appearance. Mr. Cox agreed that the "outsiders" had provoked most of the difficulty but he was not clear whether the provocative "outsiders" were sympathetic or hostile to the observance. It was agreed that the Clemson students themselves, who took part in the observance, conducted themselves in a peaceful manner. On the other hand, they were subjected to a barrage of obscenities and threats, primarily, if not wholly, from students unsympathetic to the observance.

The plaintiffs, through their counsel, conceded that, if the hosting of the regional observance was authorized, the University should take steps to provide police protection for the meetings. To aid in this, one who was cooperating with the Committee-plaintiff stated it was planned to create for those interested in the observance a group of so-called marshals to the number of one hundred, twenty-five.[2] The number of highway patrolmen, which it was thought the University should secure from the State Highway Department to afford proper protection for the observance, was never precisely stated; it was plain, however, that a substantial force was believed to be necessary. It is accordingly clear that the Committee itself felt that the observance would involve very real danger of riot and commotion. It seems likely, however, that, as the plaintiffs argue, the spark for such commotion would be struck by those opposed to the observance. It cannot be overlooked, though, that, in an hour of extreme tension and apprehension on both sides it is difficult to anticipate just what will fire an explosion.

The University, fearing a campus disruption, refused to approve the request that it approve the hosting of the regional observance. It did state to the Committee that it would happily approve a local observance, to be participated in by the students of Clemson, and to have such speakers as the Committee might like. It took the position that it could provide security for such an observance through its ability to discipline the members of its own student body. This permission, which apparently the Committee spurned, provided those members of the Clemson student body with the freest possible right of assembly and of speech, according to the University authorities.

On a few occasions since 1964, the University, at the instance of recognized student organizations, has permitted meetings for University students to hear

---

2. One of the functions of such marshals, as envisaged by Mr. Rogers, the coun-selor of the plaintiffs, was to prevent "pot smoking" at the observance.

political speakers. While, as said, meetings have been held on University premises for University students and sponsored by a recognized student organization, there was no restriction on public attendance. There was no public announcement of the meeting as one for the general public but the meeting was advertised as one sponsored by Clemson students for Clemson students.

The plaintiffs refer in their affidavits to two meetings held in University facilities, with the permission of the University authorities, at which representatives from colleges within the State were invited, for the purpose of conducting "Black Identity" studies. The purpose of such meetings was seemingly to bring together black and white students so that the two groups could better understand one another and live together more harmoniously. So far as the record shows, despite the fact that the subject for discussion at such meetings was one that in the past would have been regarded as explosive in the South, no difficulties were encountered and no threat of violence had.

On the basis of these facts, the plaintiffs assert that the University, in denying them the right to host the regional meeting, has illegally curtailed their constitutional rights of free speech and assembly and has denied them the equal protection of the laws. The defendants deny any such infringement of the plaintiffs' rights and have moved to dismiss the proceeding for want of federal question.

■ I am of opinion that, on this record, the temporary restraining order sought by the plaintiffs should be denied.

The claim of an infringement of the constitutional right of free speech and assembling is novel. Unlike the situation in Hammond v. South Carolina State College (D.C.S.C.1967) 272 F.Supp. 947, the plaintiffs have not been denied the right to assemble in protest; that right, it is conceded, the University has offered the plaintiffs. Unlike Tinker v. Des Moines Independent Community School Dist.

(1969) 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731, the plaintiffs are not restrained in their right to demonstrate in support of their views through an observance program; that right, too, the University has recognized and permits. Unlike Dickson v. Sitterson (D.C.N.C. 1968) 280 F.Supp. 486, and Brooks v. Auburn University (D.C.Ala.1969) 296 F.Supp. 188, the University has imposed no ban on any speaker; the plaintiffs have been given the right to invite to the campus for an observance of a Vietnam Moratorium any speaker they desire.

All that the plaintiffs are denied, according to their own statement of their complaint in their own brief, is the right "to host a regional Vietnam Moratorium Day Observance" on the Clemson campus, utilizing for such purposes University grounds and facilities and operating under at least the semi-official auspices of the University. In fact, they claim that this is a right any group, however informal, has, because the University's property is State property. I do not think constitutional rights extend so far. As the Court said in Adderley v. Florida (1966) 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed. 2d 149, reh. den. 385 U.S. 1020, 87 S.Ct. 698, 17 L.Ed.2d 559, the right of free speech does not mean the right may be exercised on public property any way one pleases in any place one chooses. When a public college or university extends to its students the right to assemble, to demonstrate and to speak, using such speakers as they select, it has accorded to its students free speech. It does not have to make of its campus, dedicated to educational pursuits for its own students, a "donnybrook" or a "Woodstock" for students, drawn from a widely distributed area and in no wise subject to the control of its own disciplinary procedures, in order for them to have a meeting on its premises using its facilities, especially when it is conceded that such meeting involves dangers of rioting against which the University should, in proper caution (as the plaintiffs by their counsel concede in this case), guard by importing onto its campus a considera-

ble body of outside policemen. The very presence of such outside policemen, as recently experienced at other universities and colleges, is an incitement to violence by the students.[3] For this reason, wise counselors have suggested that, if at all possible, such outside forces should never be brought on the campus. Yet, as I have said, the plaintiffs herein express the opinion that, because of the circumstances attending the earlier observance at the University, a substantial body of these outside forces should be stationed on the campus as a precautionary measure.

The plaintiffs contend that, to deny them the right here sought would be to deny them equal protection of the law. This claim of infringement rests on the fact that the University has permitted other groups to have meetings on the campus. Three of these meetings were sponsored by local campus groups for the benefit of the student population. They were local or University affairs, though a few members of the public may have attended. They were the same as the observance the University permitted the plaintiff group to have on October 13 and have offered to permit on November 14. There is no difference in treatment between that accorded the rights of the plaintiffs and those given these three groups.

The only type of meeting authorized by the University having any analogy to that proposed by the plaintiffs is the "Black Identity" meetings. These have not been confined to Clemson students. Students from other colleges in the State of South Carolina have been invited to attend. But, it is conceded that there has never been either any violence or even threat of

violence at such meetings—and this represents an important difference between such meetings and that proposed by the plaintiffs.[4] Too, these meetings were far smaller than that proposed by the plaintiffs. They posed none of the problems of housing and feeding created by the proposed meeting. To bring thousands of visitors on a college campus for a midnight vigil is almost an invitation to violence. And this would be especially true in a small, remote college community such as Clemson.

The plaintiffs suggest that the defendants have denied them the right to "host" the regional conference because of the fear of public resentment. They picture the action of the defendants as a craven truckling to majority opinion on the part of the "Establishment". This argument lacks persuasiveness. If, in approving or disapproving a meeting, the defendants were motived by considerations of public approval, they would hardly have authorized the "Black Identity" meetings. These dealt with a subject fraught with far more combustible features than that involved in the proposed observance. The very fact that the University authorities have authorized and supported these "Black Identity" meetings is cogent proof of their good faith in seeking fairly to secure to their students their rights of free speech and assembly and the opportunity to discuss candidly subjects on which there are strong feelings still in South Carolina. For this reason I cannot take lightly their expressions of fear of violence and commotion that would attend the proposed regional meeting.

The plaintiffs argue that the only threat of violence comes from those of

---

3. Consider, for instance, the situation at Columbia University.

4. These "Black Identity" meetings have far more academic relevancy over the long run than the Vietnam Moratorium. Colleges and universities will likely be faced with problems of black-white student relationship for years to come. It is in the interest of the academic community that every effort be made, through meet-

ings such as these "Black Identity" meetings, to soften any feelings of racial hostility among students and to promote racial harmony. On the other hand, it is hoped that Vietnam will be resolved in the next year or so; both "hawks" and "doves" profess a desire to see a prompt end to our involvement, the difference between them is often stated as one of timing.

the Clemson students who are hostile to the demonstration; and that it is unfair to permit them, by their threat of violence, to prevent the regional observance. Cox v. Louisiana (1965) 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471; Edwards v. South Carolina (1963) 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697. There is much merit in this point if the issue was protection of the right of the Clemson student himself to free speech; and, if the threat was permitted by the defendants to prevent the plaintiffs from having a demonstration of their views on Vietnam or from exercising free speech, appeal to this Court might well be appropriate. But this is not the situation. The University accepts its responsibility to assure to its students the right to free speech as to the Vietnam involvement and it is prepared to provide protection for the exercise of such rights. It does not accept, however, the responsibility for sponsoring a gathering of students from over five or six states, students for whose conduct it cannot be responsible and whose conduct it cannot restrain by the threat of disciplinary action. Some of those students may come for purposes of disrupting the meeting; some may come for using it as a means of creating hostility and for generating an environment rife for violence. The University is entitled to protect itself from such difficulties, created by persons to whom it owes no responsibility. Its requirement to accord constitutional rights may well be deemed to extend merely to its own students.

Finally, even the plaintiffs are at some loss on the nature of the order they seek. They have no real plans for their proposed conference. They admit that the extent of any order that the Court might enter would be to require the defendants "to cooperate reasonably" with the plaintiffs in planning a regional meeting to be held some three days away. Such an order would be vague; it would lack the definiteness probably necessary for enforcement by contempt proceedings. When issued, the Court would no doubt be asked, in order to assure that both parties were proceeding in good faith, to maintain almost continuous surveillance of the cooperation between the plaintiffs and the defendants. In fact, it is very doubtful that given the small amount of time intervening before the observance, any regional meeting could be had. Invitations could hardly reach most of the student groups before the date for the observance. The security arrangements which the plaintiffs themselves assert would be necessary, at this stage cannot be assured on such short notice. All in all, this application comes so late that, if any affirmative action were taken, this Court would likely be required to supervise every detail of the planning. That is not a proper role for the judiciary.

Under all the circumstances and given proper regard to all the facts, I feel the application for a temporary restraining order herein should be denied.

And it is so ordered.