Gregory M. **DUNKEL**

v.

Wilson H. **ELKINS**, President, University of Maryland, Marvin Mandel, Governor, State of Maryland, and the State of Maryland.

Civ. No. 70–1239–K.

United States District Court,
D. Maryland.

March 17, 1971.

Thomas R. Asher, Washington, D. C., and Russell R. Reno, Jr. and Douglas D. Connah, Jr., Baltimore, Md., for plaintiff.

Francis B. Burch, Atty. Gen. of Md., and Estelle A. Fishbein, Asst. Atty. Gen., for defendants.

Before SOBELOFF, Circuit Judge, and WATKINS and KAUFMAN, District Judges.

FRANK A. KAUFMAN, District Judge.

Plaintiff, Gregory M. Dunkel, an Assistant Professor of Mathematics at Howard University, Washington, D. C., since February, 1970, and the holder of degrees of Master of Science and Ph.D. (Mathematics) from the University of Maryland in 1965 and 1967, asks this Court to declare unconstitutional Md. Ann.Code art. 27, § 577B (1970 Cum. Supp.), and to enjoin defendants from enforcing its provisions against plaintiff or any other person. Defendants are the Honorable Marvin Mandel, Governor

of Maryland; Wilson H. Elkins, President of the University of Maryland; and the State of Maryland. Jurisdiction is invoked pursuant to 28 U.S.C. § 1343, the jurisdictional counterpart of 42 U.S. C. § 1983 and related sections. A three-judge court was prayed and convened pursuant to 28 U.S.C. §§ 2281 and 2284. Both sides have filed motions for summary judgment. The facts are established by uncontroverted affidavits, except in a few instances. The factual disputes posed by the latter are not material to the resolution of the legal issues presented herein.

I

The College Park campus of the University of Maryland was, in the spring of 1970, a scene of the utmost turmoil. On May 4, 1970, Governor Mandel proclaimed that "a state of public crisis, emergency and civil disturbance exists within the vicinity of College Park, Maryland,"[1] ordered the Maryland State Militia into active service, and gave it "full power and responsibility for [the] area of the University of Maryland Campus at College Park. * * *"[2] On May 15, 1970, the Adjutant General of Maryland prohibited the possession or transportation of gasoline or other flammable liquids (except in the tank of a motor vehicle) on that campus.[3]

On May 4, 1970, plaintiff was observed on the campus, apparently "leading * * * [a] mob of students * * *" which shortly afterwards broke down the doors of the main administration building.[4]

1. Proclamation of Governor Mandel at 8:00 p. m., May 4, 1970.

2. Executive Order of Governor Mandel at 8:15 p. m., May 4, 1970.

3. Order of Adjutant General of Maryland, May 15, 1970. That order was rescinded on May 28, 1970.

4. Affidavit dated December 7, 1970 of Walter B. Waetjen, Vice President for General Administration of the University. Estelle A. Fishbein, Esq., Special Assistant Attorney General of Maryland, has

submitted an affidavit, dated December 8, 1970, stating that when she observed plaintiff leading those students, he was "carrying what appeared to be a long metal rod or bar * * *." Plaintiff, in a counter affidavit, has disputed that latter statement, stating that he was only carrying a "furled umbrella."

A former chief of the University's police force, Daniel Wiseman, has stated in an affidavit, dated December 7, 1970, that:

* * * during commencement exercises in June 1968, I personally removed Gregory Dunkel from the north end of

On March 26, 1970, plaintiff was seen on the campus, apparently,

> * * * coordinating or assisting [a group of students who had been arrested for a recent "sit-in"] in their efforts to disrupt the faculty meeting then in progress by yelling and shouting obscenities at appropriate times when speeches, motions, or votes were taken to which the group was opposed. * * * 5

On April 7, 1970, plaintiff was photographed along with a number of students "blocking and disrupting vehicular traffic" on the University's grounds.[6]

On May 14, 1970, plaintiff was observed on the steps of the main administration building shortly after its locked doors "were broken and certain individuals, many of whom were students, forcibly entered the building." [7]

On May 18, 1970, President Elkins addressed the following written notice to Dunkel:

> You are hereby requested to leave the campus premises and you are advised that *henceforth* you are denied the right of access to the buildings and grounds of the University of Maryland. In the event that you are found in or upon the University premises or property, you will be subject to prosecution as provided in Article 27, Section 577B of the Annotated Code of Maryland.[8] [Emphasis supplied.]

---

the Cole Field House where he had appeared in an academic gown, but without the required mortarboard cap. At that time he was not a member of the graduating class, nor was he on the faculty, and his presence was improper and unauthorized.

Plaintiff, in his affidavit of December 29, 1970, states that he was in Canada at the time of the June, 1968 graduation and claims that, in any event, he had a right to be present at those exercises.

Mr. George O. Weber (see n. 5, *infra*) has also stated under oath, in an affidavit dated December 7, 1970, that, as early as October 5, 1969, he

> * * * saw Gregory Dunkel on campus assisting in the carrying of sound amplification equipment which was subsequently used. This was during the time that a University regulation was in force which prohibited sound amplification equipment to be used without prior permission of the Administration. I knew that neither Mr. Dunkel nor anyone else had obtained such permission for use of sound amplification equipment at that time.

In a separate affidavit of the same date, Mr. Weber has estimated that the damage to the physical plant at the College Park campus by the "student disorders * * * beginning May 1, 1970 * * * *" was in excess of $63,000.

5. Affidavit of George O. Weber, Director of the Physical Plant Department of the University, dated December 7, 1970.

6. Affidavit of William J. Speizman, a photographer employed by the University, dated December 10, 1970. That photograph is in evidence in this case.

7. Affidavit of Robert A. Beach, an Assistant to the President of the University, dated December 8, 1970.

8. President Elkins has stated, *inter alia*, in an affidavit dated December 8, 1970:

> * * * At the time of the presentation of the "Notice" to Mr. Dunkel, the College Park campus was in the midst of a period of extreme turmoil, marked by disruptive activities, arson and riots. There were several incidents of arson and in one such incident, on the evening of May 14, 1970, arsonists set fire to the Main Administration Building and the offices of several of the officers of the University Administration were broken into and the furniture and contents were destroyed or damaged. During this period the National Guard was called to College Park to assist in the maintenance of order and the protection of University property. It was necessary for the National Guard to remain on the campus until June 6, 1970, when the semester terminated. * * * I ordered the "Notice" served on Gregory Dunkel because I knew of his participation in several incidents of disruption on the College Park campus. It was my belief that his continued presence on the campus during the period of extreme emergency which existed would pose a substantial threat to the peace and good order of the University community.

That notice was served on Dunkel on May 19, 1970.[9]

Dunkel has submitted an affidavit, dated December 29, 1970, stating, *inter alia*:

1. * * *

2. On May 19, 1970 at about 1:00 P.M., I was served by a member of the police force of the University of Maryland with a document captioned "NO-. TICE" [set forth *supra* at p. 1238] * * *. I have never been advised of the reason for the issuance of this notice to me (other than the vague conclusion expressed in the affidavit of Wilson H. Elkins [see n. 8, *supra*] * * *), nor have I been advised of, nor given the opportunity to attend, any hearing relating to the issuance of the notice.

3. At the time of the issuance of the notice, and at all other times that I have been present on the premises of the University of Maryland, I have been engaged in lawful activities including the communication of ideas and information to members of the faculty and students of the University.

4. The University of Maryland is a public institution funded and operated by the State of Maryland under the supervision of the Governor of Maryland. Its premises and many of its buildings are open to the general public. The grounds of the University are often used by the public for recreational purposes and the University maintains on its grounds several businesses open to the public including an ice cream parlor and athletic exhibitions. In addition, the University makes many of its facilities available to persons or groups not directly connected with the University of Maryland, sometimes for compensation. I personally have come upon the University of Maryland's campus at least 100 times since my graduation in 1967, and except for the delivery of the above referred to notice to me on May 19, 1970, I have never been told that I was not permitted to be on campus or asked to state the reason for my presence on campus. During the many years that have elapsed since I commenced my studies at the University of Maryland campus, I can recall no occasion when a member of the general public was asked to leave the University's premises. To the best of my knowledge, the University of Maryland's campus police force makes no attempt, on any regular basis, to exclude members of the general public from using the walkways, stores and lawns of the University of Maryland. The campus of the University of Maryland is bisected by an east-west street known as Campus Drive which is constantly used by members of the general public to cross from U. S. Route 1 (Washington Boulevard) to Maryland Route 193 (University Boulevard). In addition, the campus is bisected by U. S. Route 1, a heavily traveled north-south highway.

5. Since I ceased to be a student at the University, I have confined my presence at the University to places open to the general public or to places specifically to which I was granted access by duly authorized students, faculty members or other officials of the University.

6. Since the receipt by me of the aforesaid notice, I have been warned by members of the University's police force that my presence on the University's premises or grounds will result in my arrest and prosecution under Section 577(B). * * * [10]

9. The officer who served the notice, L. B. Janowski, has stated in an affidavit dated December 9, 1970, that, when served, plaintiff was standing in front of one of the administration buildings of the University in which, at that time, "60 students were engaged in a sit-in in the corridors * * *."

10. Paragraph 6 of Dunkel's affidavit continues:

In particular, in July of 1970, I had occasion to go with one of my friends

7. In my professional capacity as a mathematician, as an associate professor of mathematics at Howard University, as an alumnus at the University of Maryland, and as a member of the public, I have need and desire to converse, consult and otherwise communicate with students and faculty members at the University's College Park Campus. On a number of occasions in the past, I have attended meetings of mathematicians held at the University of Maryland, have lectured in a professional capacity at the University of Maryland in conjunction with its Math Department, have attended symposia on mathematics at the University of Maryland, and have conversed with its professors and students concerning matters in the field of mathematics.

8. * * * [In its] May 20, 1970 issue, * * * "The Diamondback", the University's newspaper * * * quotes a University official who explained that the notice to me was issued because "he is a menace everytime he speaks on campus". I believe that the issuance of the notice to me was based upon utterances by me at or about the University, which speech is protected by the First Amendment to the Federal Constitution and has given rise to no criminal charges against me.

* * * * * *

## II

Article 27, section 577B provides as follows:

The highest official or governing body of the University of Maryland, any of the State colleges, any community college or public school may deny access to the buildings or grounds of the institution to persons

to the Emergency Room of the University of Maryland Hospital located in Baltimore, Maryland. While in the emergency room, I was approached by a member of the University's police force and told that because of my presence on University property, I was subject to arrest. At that time, I remonstrated with the officer, who finally agreed that because of the emergency situation, I should be allowed to remain. In late September of 1970, I advised Mr. William Gerson, a member of a duly recognized campus organization known as D.R.U.M., that because of the notice served upon me, I could not appear on the campus. Mr. Gerson later told me that he thereafter met with C. E. Bishop, Chancellor of the College Park campus of the University of Maryland and asked that I be allowed back upon the campus. Later Mr. Gerson showed me the letter dated October 26, 1970, which Chancellor Bishop addressed to him, which letter advised that my banishment "can be lifted only by the person who imposed it, Dr. Elkins, or by the courts." * * *
William H. Williams, in an affidavit dated January 8, 1971, has stated, *inter alia*:

The police force utilized to serve on the Baltimore City Campus of the University of Maryland is a separate organizational unit from that serving on the College Park Campus. I am in charge of the Baltimore City Campus police personnel, but the College Park Campus police are supervised by a different Captain. There is no interchange of police personnel between the Baltimore City Campus and the College Park Campus, and there was no such interchange of personnel in May, June and July of 1970. * * * At no time did I ever receive information relating to the banning of Gregory M. Dunkel from the premises of the University of Maryland pursuant to a "Notice" signed by President Elkins, and I was not aware of the issuance of this order, or of the existence of Mr. Dunkel until after Mr. Dunkel instituted this suit. Therefore, I have never issued or relayed any orders to the police personnel under me relating to Mr. Dunkel. * * * I have searched by files and records and can find no incident report describing the alleged encounter between Mr. Dunkel and a member of my police staff. * * * I have inquired of my police personnel and all indicate that (1) they had no knowledge of the "Notice" issued by President Elkins, (2) that they had no knowledge of Mr. Dunkel or of his identity, and (3) that they did not encounter Mr. Dunkel at any time before, during or after July, 1970, on the Baltimore City Campus or in the University of Maryland Hospital.

who are not bona fide, currently registered students, staff, or faculty at the institution, and who have no lawful business to pursue at the institution, or who are acting in a manner disruptive or disturbing to the normal educational functions of the institution. Administrative personnel and staff of the University of Maryland, any of the State colleges, any community college or public school may demand identification and evidence of qualification for use of anyone desiring to use or come upon the premises of the particular institution. Whoever shall trespass upon the grounds of the University of Maryland, any of the State colleges, any community college or public school or who refuses or fails to leave the buildings or grounds of these institutions after being requested to do so by an authorized employee of the institution, or who wilfully damages or defaces any of the buildings, furnishings, statues, monuments, memorials, trees, shrubs, grasses, or flowers on the grounds of such institutions shall be guilty of a misdemeanor, and upon conviction thereof, shall be fined not more than $1,000.00, or imprisoned for not more than six months, or both, in the discretion of the court.

■ That statute is in no way ambiguous. Therefore, there is no basis for the abstention by this Court sought by defendants. As Mr. Justice Douglas recently wrote in Wisconsin v. Constantineau, 400 U.S. 433, 439, 91 S.Ct. 507, 511, 27 L.Ed.2d 515 (1971):

* * * the naked question, uncomplicated by an unresolved state law, is whether that Act on its face is unconstitutional. * * * [A]bstention should not be ordered merely to await an attempt to vindicate the claim in a state court. Where there is no ambiguity in the state statute, the federal court should not abstain but proceed to decide the federal constitutional claim. * * * We would negate the history of the enlargement of the jurisdiction of the federal district courts, if we held the federal court should stay its hand and not decide the question before the state courts decided it. [Footnote omitted.]

### III

■ Plaintiff contends that that statute is impermissibly vague and overbroad, particularly because of the clauses: "persons * * * who have no lawful business to pursue at the institution"; and "persons * * * who are acting in a manner disruptive or disturbing to the normal educational functions of the institution." However, the statutory language is not such that—

* * * men of common intelligence must necessarily guess at its meaning and differ as to its application * *."

Baggett v. Bullitt, 377 U.S. 360, 367, 84 S.Ct. 1316, 1320, 12 L.Ed.2d 377 (1964). The "no lawful business to pursue" test, set forth in section 577B, seemingly excludes all constitutionally protected activity. Thus, unlike the statute held overbroad in Dombrowski v. Pfister, 380 U.S. 479, 491, 85 S.Ct. 1116, 1123, 14 L.Ed.2d 22 (1965), a "readily apparent construction suggests itself as a vehicle for rehabilitating the statutes," i. e., any constitutionally protected activity is a "lawful business." Although section 577B does not define what activities are so constitutionally protected, the range of uncertainty inherent in its language is not such that would "broadly stifle fundamental personal liberties when the end can be more narrowly achieved." (Footnote eliminated.) Aptheker v. Secretary of State, 378 U.S. 500, 508, 84 S.Ct. 1659, 1665, 12 L.Ed.2d 992 (1964), quoting from Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).

Plaintiff cites Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940), as support for his contention that the "no lawful business" standard is unconstitutional. The state statute under consideration in *Thornhill* prohibited persons from going near or loitering about a business premise "without a just cause or legal excuse" (310 U.S. at 91, 60 S.Ct. at 739) for the purpose, *inter*

*alia,* of inducing others not to deal with that business.[11] After noting (at 100, 60 S.Ct. at 743) that "[t]he phrase 'without a just cause or legal excuse' does not in any effective manner restrict the breadth of the regulation," Mr. Justice Murphy revealed the concern of the Court with the statute's explicit language. Thus, he wrote (at 100–101, 60 S.Ct. at 743–744):

> * * * The courses of action, listed under the first offense, which an accused—including an employee—may not urge others to take, comprehends those which in many instances would normally result from merely publicizing, without annoyance or threat of any kind, the facts of a labor dispute. An intention to hinder, delay or interfere with a lawful business, which is an element of the second offense, likewise can be proved merely by showing that others reacted in a way normally expectable of some upon learning the facts of a dispute. The vague contours of the term "picket" are nowhere delineated. Employees or others, accordingly, may be found to be within the purview of the term and convicted for engaging in activities identical with those proscribed by the first offense. In sum, whatever the means used to publicize the facts of a labor dispute, whether by printed sign, by pamphlet, by word of mouth or otherwise, all such activity without exception is within the inclusive prohibition of the statute so long as it occurs in the vicinity of the scene of the dispute. [Footnotes omitted.]

Unlike section 577B, therefore, the statute in *Thornhill* barred, on its face, constitutional activity.

11. The Alabama statute held unconstitutional in *Thornhill* provided:

"* * * Loitering or picketing forbidden.—Any person or persons, who, without a just cause or legal excuse therefor, go near to or loiter about the premises or place of business of any other person, firm, corporation, or association of people, engaged in a lawful business, for the purpose, or with intent of influencing, or inducing other persons not to trade with, buy from, sell to, have

■ The second standard set forth in section 577B—"acting in a manner disruptive or disturbing to the normal educational functions of the institution" —is, as plaintiff points out, susceptible of an impermissible interpretation, *e. g.,* the banning of an individual whose pursuit of constitutionally protected activity "disrupts" the normal functions of the University. It is likewise, however, susceptible of a constitutionally permissible construction. Although it may be "fundamental that one may not be barred from speaking merely because his presence alone provokes riotous conduct among the audience," *Stacy v. Williams,* 306 F.Supp. 963, 977 (N.D.Miss.1969), the "disruptive" standard in section 577B does not necessarily reach that end even if that end is forbidden. As was true of the "no lawful business" test, the "disruptive" provision is reasonably compatible with a constitutional interpretation, *i. e.,* only non-constitutionally protected disruptive activities are prohibited. In the absence of any contrary interpretations by a Maryland court, we are unwilling to strike down section 577B on the grounds that it will not be construed and applied constitutionally by the courts of Maryland.

### IV

■ Defendants urge that plaintiff's use of public land and property is a "privilege withdrawable by the State at any time for any reason." We do not agree. While the State undoubtedly possesses power to control the use made of its premises, it cannot do so without regard to the Constitution. Mr. Justice Stone, in *Hague v. Committee for Indus-*

business dealings with, or be employed by such persons, firm, corporation, or association, or who picket the works or place of business of such other persons, firms, corporations, or associations of persons, for the purpose of hindering, delaying, or interfering with or injuring any lawful business or enterprise of another, shall be guilty of a misdemeanor; but nothing herein shall prevent any person from soliciting trade or business' for a competitive business."

trial Organization, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939), laid defendants' argument to rest when he wrote:

> * * * Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. * * *

Nor can there be much doubt that a University campus is such a "public place." As Judge Hemphill noted in Hammond v. South Carolina State College, 272 F. Supp. 947, 949 (D.S.C.1967), in which students challenged a college rule:

> * * * The power of the president to oversee, to rule, is an integral part of the mechanism for providing and promoting education at State College. Be that as it may, colleges, like all other institutions, are subject to the Constitution. Academic progress and academic freedom demand their share of Constitutional protection. * * * [12]

*See also* Brooks v. Auburn University, 412 F.2d 1171, 1172 (5th Cir. 1969), in which plaintiffs were students and faculty members of the University.

However, a determination that a state university campus is a public campus tells only part of the story. Writing principally of the rights of students, Professor Wright has suggested: [13]

> But it does not advance the analysis to suggest that because a university is owned by the public and ordinarily open to the public, decisions on what must be permitted in other places are automatically applicable to the university. As Justice Fortas wrote last year:
>
>> public use does not authorize either the general public or the university faculty and students to use them in a way which subverts their purpose and prevents their intended use by others. The public character of a university does not grant to individuals a license to engage in activities which disrupt the activities to which those facilities are dedicated.[14]
>
> The state may be required to tolerate discussions intended to publicize anti-war views in the Port Authority Bus Terminal. It need not tolerate such discussions in the reading room of the university library. The factors to be considered, such as "the character of the place, the pattern of usual activity, the nature of its essential purpose and the population who take advantage of the general invitation extended * * * are essentially the same." But examination of these factors leads to different results in different cases. [Footnotes to this paragraph omitted.]

In this case, we need not reach the question of whether the University of

---

12. In Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 512 n. 6, 89 S.Ct. 733, 739–740, 21 L.Ed. 2d 731 (1969), Mr. Justice Fortas, discussing *Hammond*, stated:

> * * * Judge Hemphill * * * pointed out that a school is not like a hospital or a jail enclosure. * * * It is a public place, and its dedication to specific uses does not imply that the constitutional rights of persons entitled to be there are to be gauged as if the premises were purely private property. * * *

*Cf.* Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc., 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968) (privately owned shopping center's public areas); Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946) ("company town").

13. Wright, The Constitution on the Campus, 22 Vand.L.Rev. 1027, 1040 (1969).

14. Footnote 64 which appears at this position in the quoted text from Wright, *supra*, cites the following authorities: A. Fortas, Concerning Dissent and Civil Disobedience 46–47 (1968); and Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc., 391 U.S. 308, 320, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968).

Maryland could have limited use of the campus to students, faculty and administration, and thus could have excluded all outsiders. In Stacy v. Williams, *supra*, a three-judge district court, in considering challenges by students, faculty and others to regulations relating to outsiders permitted to speak on campus, wrote (306 F.Supp. at 969–971): [15]

We begin with the premise that the facilities of state colleges and universities, dedicated as they are to the specialized function of education, may be utilized solely for that purpose. "The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." Adderly v. State of Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966). [16]

Thus, the freedoms of speech and assembly, while occupying a "prefer- red position" among constitutional liberties, may not be exercised on public property without regard to its primary usage. Moreover, wherever the policy is to allow outside speakers not connected with the university, it does not follow that the freedoms of speech and assembly of those persons on campus—students and faculty alike—may be exercised by anyone, at any time or place and regardless of the circumstances or probable consequences of the event. * * * [17] Just as the rights of students in this regard are not absolute, neither is the power of the Board, upon consent to outside speakers, so unfettered that it can be exercised in censorship over what is and what is not acceptable or in other arbitrary fashion. [18]

The interest of both students and Board can, and must, yield to harmonious accommodation under the Consti-

15. Footnotes 9 through 11 to the portion of the *Stacy* opinion quoted below have been renumbered herein as our footnotes 16 through 18, respectively.

16. The only decision we find raising any doubt as to this proposition is Buckley v. Meng, 35 Misc.2d 467, 230 N.Y.S.2d 924, 933 (1962), wherein it was observed that:

"The overriding issue as to use of school facilities for non-academic purposes is not raised. Thus, while there may be no duty to open the doors of the school houses for uses other than academic—and I have some doubt even as to this proposition—once they are opened they must be opened under conditions consistent with constitutional principle[s]."

Plaintiffs in the instant case do not take issue with the power of the Board "to constitutionally limit the use of college facilities by forbidding *all* outside speakers to appear on campus and restrict campus facilities exclusively for use by immediate members of the university community." Plaintiffs' brief dated December 18, 1968, p. 21.

17. [Ferrell v. Dallas Independent School District, 5 Cir.,] 392 F.2d [697] at 704:

"But in measuring the appropriateness and reasonableness of school regulations against the constitutional protections of the First and Fourteenth Amendments the courts must give full credence to the role and purposes of the schools and of the tools with which it is expected that they deal with their problems, and careful recognition to the differences between what are reasonable restraints in the classroom and what are reasonable restraints on the street corner."

18. The clearest statement on the subject may be found in Danskin v. San Diego Unified School Dist., 28 Cal.2d 536, 545–546, 171 P.2d 885 (1946):

"Once it [the State] opens the doors, however, it cannot demand tickets of admission in the form of convictions and affiliations that it deems acceptable. * * * * *

"It is not for the state to control the influence of a public forum by censoring the ideas, the proponents, or the audience; if it could, that freedom which is the life of democratic assembly would be stilled. And the dulling effects of censorship on a community are more to be feared than the quickening influence of a live interchange of ideas."

Circuit Judge Griffin Bell, in Brooks v. Auburn University, supra, observed: "[I]t nevertheless is clear under the prior restraint doctrine that the right of the faculty and students to hear a speaker, selected as was the speaker here, cannot be left to the discretion of the university president on a pick and choose basis."

tution. In this case, the Board has not adopted an all-inclusive ban, but rather has sought to provide some opportunity, albeit limited, for students at the various institutions to hear guest speakers. For this nonexclusionary attitude it is to be commended, but as it opens the lecture halls, it must do so nondiscriminatorily. * * *

*See also* McAlpine v. Reese, 309 F.Supp. 136 (E.D.Mich.1970), in which parents of students and former students, *inter alia*, challenged conduct of school officials; Clemson Univ. Vietnam Moratorium Comm. v. Clemson Univ., 306 F.Supp. 129 (D.S.C.1969), in which plaintiffs were members of a student group at the university.

## V

■■ An educational institution possesses the power to suspend students, Stricklin v. Regents of University of Wisconsin, 297 F.Supp. 416, 419–420 (W. D.Wis.1969), appeal dismissed as moot, 420 F.2d 1257 (7th Cir. 1970); Scoggin v. Lincoln University, 291 F.Supp. 161, 172 (W.D.Mo.1968), or teachers, Lafferty v. Carter, 310 F.Supp. 465, 469–470 (W.D.Wis.1970), for proper reasons. We hold that a state university has no less a right to prohibit access to its campus to an "outsider" to the university community if he has engaged in conduct which violates constitutional standards clearly embodied in state law, particularly if there is reason to believe that he will again engage in such conduct.[19] However, except in an emergency, such powers of control should not be exercised, without a prior administrative hearing, to deprive any person, as an individual, of access to a state university campus.

In Wright, The Constitution on the Campus, *supra* n. 13, at 1071–72, the author, speaking of students' rights, wrote:

There is general agreement that four fundamental safeguards are required in every proceeding that may lead to a serious penalty. The student must be advised of the grounds of the charge, he must be informed of the nature of the evidence against him, he must be given an opportunity to be heard in his own defense, and he must not be punished except on the basis of substantial evidence. These requirements are so obvious, and so fundamental, that they require little elaboration.

In Stricklin v. Regents of University of Wisconsin, *supra*, Judge Doyle stated (297 F.Supp. at 420) that:

even when it is impossible or unreasonably difficult to accord the student a preliminary hearing prior to an interim suspension, procedural due process requires that he be provided such a preliminary hearing at the earliest practical time.

Earlier, Judge Doyle concluded that, in the factual context of the *Stricklin* case, a thirteen-day hiatus between suspension and hearing was unconstitutional (at 419):

A suspension for such a substantial interval imposed as a sanction for misconduct, without prior specification of

---

Compare the reasoning of the Supreme Court in Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 [invalidating a Louisiana statute held to vest broad discretion in state officials to deny picketing except where conducted by a labor organization], holding:

"It is clearly unconstitutional to enable a public official to determine which expressions of view will be permitted and which will not or to engage in invidious discrimination among persons or groups either by use of a statute providing a system of broad discretionary licensing power or, as in this case, the equivalent of such a system by selective enforcement of an extremely broad prohibitory statute."

19. Not only does the University of Maryland have the inherent power to control access to its premises, but other laws of Maryland in addition to Article 27, § 577B prohibit violent and disruptive activities on the campus, *e. g.*, Article 27, § 123A (disturbing activities at school or college; molesting or threatening students, etc.); Article 27, § 124 (disorderly conduct generally).

charges, notice of hearing, or hearing, would violate due process.[20]

■ Those principles are no less applicable to an individual outsider such as Dunkel. In the case at bar, while it may well have been impractical for the University officials, in the context of the emergency which existed, to have held a hearing prior to issuing and making effective the May 18, 1970 notice, the record discloses no reason why an administrative hearing could not have been held with reasonable promptness subsequent to that date. It was the duty of the University, if, because of the emergency, it could not have provided an administrative hearing prior to issuing such notice to Dunkel, to have taken the initiative to offer, and to have made suitable arrangements for, an administrative hearing as promptly as possible after that notice issued.[21] In any such hearing, the burden of proof would have been upon the University officials to establish that Dunkel, within the meaning of section 577B, had "no lawful business to pursue at the institution," or had been "acting in a manner disruptive or disturbing to the normal educational functions of the institution." *Cf.* Smith v. California, 361 U.S. 147, 151, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959).

## VI

■ Plaintiff contends that section 577B is unconstitutional because it fails to require a hearing. *Cf.* Wisconsin v. Constantineau, *supra.* But Maryland's Administrative Procedure Act, Md.Ann. Code art. 41, § 244 et seq., did require a hearing before, or in any event as promptly as reasonably possible after, the May 18, 1970 notice was given force and effect.

Article 41, section 251 provides in part:

> In any contested case, all parties shall be afforded an opportunity for hearing after reasonable notice. * * * [22]

---

**20.** *See also* Van Alstyne, The Constitutional Rights of Teachers and Professors, 1970 Duke L.J. 841, 864 et seq. A prior *judicial* hearing is not *per se* required. *Cf.* Blount v. Rizzi, 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971) ; Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). In Van Alstyne, Political Speakers at State Universities: Some Constitutional Considerations, 111 U.Pa.L.Rev. 328, 338 (1963), the author wrote:

> [A] college campus is constitutionally distinguishable from a public park in which no form of prior restraint of political assemblies is sustainable. But in regulating the use of its facilities, a state university may not discriminate among speakers on the bases either of their affiliation, or the controversial or allegedly disreputable nature of their opinions. The problem is, at heart, more a function of the equal protection clause than of substantive due process. [Footnotes omitted.]

This Court has not been referred to, nor does it have knowledge of, any suggestion by any court or writer that a student or teacher is entitled to a *judicial* hearing before his expulsion from the campus of a university, provided he is afforded an administrative hearing before, or at the very least as soon as possible after, his expulsion. There is no, reason to provide an "outsider" with any greater protection than a student or a teacher.

**21.** The availability of prompt judicial review of any determination made at such an administrative hearing is also constitutionally required. *Cf.* Blount v. Rizzi, *supra.*

**22.** The remainder of section 251 requires: * * * The notice shall state the time, place and issues involved, but if, by reason of the nature of the proceeding, the issues cannot be fully stated in advance of the hearing, or if subsequent amendment of the issues is necessary, they shall be fully stated as soon as practicable, and opportunity shall be afforded all parties to present evidence and argument with respect thereto. The agency shall prepare an official record, which shall include testimony and exhibits, in each contested case, but it shall not be necessary to transcribe shorthand notes unless requested for purposes of rehearing or court review. Informal disposition may also be made of any contested case by stipulation, agreed settlement, consent order, or default. Each agency shall adopt appropriate rules of procedure for notice and hearing in contested cases.

Article 41, section 244(c) defines "contested case" to mean—

> * * * a proceeding before an agency in which the legal rights, duties, or privileges of specific parties are *required by law or constitutional right* to be determined after an agency hearing. [Emphasis added.] [23]

 This case involves both Dunkel's right to visit the University campus and the University's right to exclude him under the standards established by section 577B. That section does not itself require a hearing. Nor seemingly does any other Maryland statute. Thus, the section 577B notice to Dunkel created a "contested case" as defined by section 244(c) of the Maryland Administrative Procedure Act *only if* Dunkel had a constitutional right to a hearing.[24] For the reasons set forth in part V of this opinion, we hold that he had that right, and that, accordingly, he was entitled to a hearing under sections 244 and 251. No such hearing was held; nor was Dunkel at any time given the opportunity to appear at any administrative hearing.[25]

---

Judicial review of any determination made in an agency hearing is, as constitutionally required (see n. 21 *supra*), made available by Article 41, section 255.

23. Article 41, section 244(a) states:

(a) *"Agency"* means any State board, commission, department or officer authorized by law to make rules or to adjudicate contested cases, except those in the legislative or judicial branches, and except the Department of Parole and Probation, the State Industrial Accident Commission, the State Insurance Department of Maryland, the Public Service Commission, the Employment Security Board and the State Tax Commission.

The Court of Appeals of Maryland has, in considering issues in no way related to Maryland's Administrative Procedure Act, and indeed in cases antedating the enactment of that act, concluded that the University of Maryland is "an arm or agency of the state government * * *." University of Maryland v. Maas, 173 Md. 554, 557, 197 A. 123, 124 (1938), *citing* University of Maryland v. Murray, 169 Md. 478, 182 A. 590 (1935). That Court has also construed the word "agency" to include all of Maryland's agencies except those expressly excluded. Kaufman v. Taxicab Bureau, Baltimore City Police Dept., 236 Md. 476, 479–480, 204 A.2d 521 (1964), cert. denied, 382 U.S. 849, 86 S.Ct. 95, 15 L.Ed.2d 88 (1965). *See also* Md. Board of Pharmacy v. Peco, Inc., 234 Md. 200, 198 A.2d 273 (1964). There is no reason to believe that the University of Maryland is not such an "agency." Indeed, defendants concede that it is.

24. *Cf.* Bernstein v. Bd. of Education, 245 Md. 464, 471–473, 226 A.2d 243 (1967).

25. In State Dept. of Health v. Walker, 238 Md. 512, 209 A.2d 555 (1965), the Court of Appeals of Maryland, in a 4–3 decision, stated (at 522) that Maryland's Administrative Procedure Act did not provide a requirement for an agency hearing in connection with the dispute in that case. In the *Walker* case, the State Health Department was not required by any of its own regulations, or, seemingly, by any Maryland statute, to hold a hearing, and the reasoning of the majority opinion of the Court of Appeals rather clearly compels the conclusion that that Court did not believe that any administrative hearing was constitutionally required. Herein, this Court, for reasons discussed in part V of this opinion, concludes that Dunkel was constitutionally entitled to an administrative hearing in connection with the issuance of the section 577B notice by President Elkins.

In this case, both sides take the position that the Maryland Administrative Procedure Act is not applicable, the plaintiff contending, *inter alia*, that section 577B is facially unconstitutional because a hearing is constitutionally required, because that section does not require a hearing, and because Maryland's Administrative Procedure Act is not applicable. Defendants urge that section 577B requires no hearing, that Maryland's Administrative Procedure Act is not applicable, and that section 577B is not facially unconstitutional because no hearing is constitutionally required.

Plaintiff also contends that the Maryland Administrative Procedure Act is inapplicable because the General Assembly of Maryland, when it passed the law, and the University, since the enactment of the law, have not contemplated a hearing in connection with a section 577B notice, and also because the University has not adopted rules for the conduct of hearings as required by Article 41, section 245. But such lack of contemplation and such failure to enact rules in no way alter the conclusion of this Court—which is com-

In so ruling, we reject defendants' contention that the Maryland Administrative Procedure Act was not so applicable because section 577B defines a criminal offense and provides criminal penalties; and because a person such as Dunkel is constitutionally entitled only to a hearing during the criminal proceedings which follow his failure to abide. by a section 577B notice and not to an administrative hearing in connection with whether such notice should validly issue. But what was immediately at issue after President Elkins served his May 18, 1970 notice on Dunkel was not the constitutionality of any possible future criminal proceeding growing out of any failure by Dunkel to abide by that section 577B notice, but rather the constitutional right of a campus outsider (Dunkel can so fairly be described) not to be excluded from the University's campus, upon which he had a limited constitutional right to be present, without affording to him an administrative hearing to determine whether, in accordance with the standards provided by section 577B, the University could deny to him entry upon its campus.

## VII

■ On November 6, 1970, several days after this suit was instituted, Estelle A. Fishbein, Special Assistant Attorney General for the State of Maryland, and counsel for defendants herein, informed plaintiff's counsel by letter that:

It is the position of the University that the terms of the notice dated May 18, 1970, addressed to Mr. Dunkel and

signed by Dr. Wilson H. Elkins, expired with the termination of the state of emergency on the College Park campus and the close of the spring semester.[26]

Because plaintiff is no longer prohibited from the campus, defendants contend that the present action has become moot and that therefore there is no justiciable controversy before this Court.[27] We cannot agree: The fact that plaintiff has, in the recent past, allegedly been deprived of his constitutional right to an administrative hearing gives to this action the immediacy and reality demanded by Article III of the Constitution.

In Golden v. Zwickler, 394 U.S. 103, 108, 89 S.Ct. 956, 959, 22 L.Ed.2d 113 (1969), quoting Maryland Casualty Co. v. Pacific Coal and Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941), Mr. Justice Brennan defined the standards to be applied in issuing a declaratory judgment:

[T]he question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

This action satisfies that test: There is no contention that the positions of the parties are not sufficiently adverse; the requisite immediacy and reality are supplied by the more than remote possibility that plaintiff, having once been subjected, without a hearing, to a section 577B prohibition,[28] will in the future be

---

pelled once this Court holds that a hearing is constitutionally required—that section 251 of the Maryland Administrative Procedure Act is applicable.

26. Neither section 577B nor the notice given plaintiff indicates that the order was effective only until the end of the "emergency" period.

27. Plaintiff questions whether Mrs. Fishbein is authorized to rescind the section 577B order and has submitted a letter

from the Chancellor of the University, C. E. Bishop, dated October 26, 1970. In that letter, Chancellor Bishop states that plaintiff's "banishment can be lifted only by the person who imposed it, Dr. Elkins, or by the courts." This Court, however, accepts as binding on the University and its President the assertion by their counsel that the "banishment" has been "lifted."

28. Plaintiff was the only person subjected to such an order.

similarly restrained from entering the College Park campus. "The threat of sanctions may deter their [First Amendment rights'] exercise almost as potently as the actual application of sanctions." N.A.A.C.P. v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963). *See generally,* 6A Moore, Federal Practice ¶57.13, stating that "* * * where there is a likelihood that the act complained of will be repeated, the issues remain justiciable, * * *."

Defendants rely on Gray v. Board of Trustees, 342 U.S. 517, 72 S.Ct. 432, 96 L.Ed. 540 (1952), and Watkins v. Chicago Housing Authority, 406 F.2d 1234 (7th Cir. 1969). Both actions were dismissed as moot. In *Gray,* the plaintiff therein was, after the commencement of the suit, admitted to the University from which she alleged she was discriminatorily excluded, thereby achieving the object of her suit. In *Watkins,* the plaintiffs therein, tenants challenging their eviction from publicly-owned housing, were, after the suit was commenced, "restored to their original status" (at 1235). After regaining tenant status, the plaintiffs in *Watkins* were still subject to renewed subsequent eviction notices. In *Gray,* the plaintiff was, after her admission to the University, still subject to discriminatory suspension or expulsion. But in both *Watkins* and *Gray,* at least the respective defendants had retreated from the original positions they had asserted. Here, the University's President has not retreated from his position that he had the right to issue a section 577B notice without a hearing. Rather, that official has simply stated, through his attorney, that the emergency, which prompted him to issue such a notice, is over. He has in no way admitted any error of law.

## VIII

Dunkel's motion for summary judgment is granted and that of defendants is denied. Judgment is hereby entered for plaintiff, reflecting this Court's holding that plaintiff should have been afforded an administrative hearing. Because, however, the section 577B notice to Dunkel was withdrawn on November 6, 1970 and because this Court is satisfied that in the future the defendants will afford to Dunkel, or to any other person to whom a notice is sent under section 577B, a hearing as required by Article 41, section 251 and in accordance with this opinion, this Court concludes that there is no present need to grant any injunctive or other equitable relief. As for the declaratory relief sought by plaintiff in connection with the alleged facial unconstitutionality of Article 27, section 577B, this Court holds that that statute, read in conjunction with Article 41, sections 244 and 251, is constitutional. Therefore, plaintiff's request for such declaratory relief is denied. Court costs will be borne by the defendants.

It is so ordered.