305 S.E.2d 343

**UNITED MINE WORKERS OF AMERICA INTERNATIONAL UNION, By its Officers Richard TRUMKA, Cecil Roberts and John Banovic**

v.

**Michael PARSONS, Assistant Athletic Director, West Virginia University and West Virginia Board of Regents, a Statutory Corporation.**

No. 15831.

Supreme Court of Appeals of West Virginia.

July 8, 1983.

McIntyre, Haviland & Jordan and James M. Haviland, Charleston, Michael H. Holland, Gen. Counsel, United Mine Workers of America, Washington, D.C., for petitioners.

Gene R. Nichol, Jr., Morgantown, for respondents.

McGRAW, Chief Justice:

In this original proceeding in mandamus, the Court is asked to examine the constitutional obligation of a state-supported university to afford interested parties an opportunity to respond to political speech contained in radio advertisements broadcast as part of a university athletic event.

The petitioners, Richard Trumka, Cecil Roberts and John Banovic, initiated this proceeding on behalf of the United Mine Workers of America (UMWA), a voluntary association and international union which represents coal miners throughout West Virginia. The respondents are Michael Parsons, assistant athletic director at West Virginia University (WVU), and the West Virginia Board of Regents, a statutory corporation responsible for all public higher education activities in West Virginia.

The petitioners seek to compel the respondents to provide them an opportunity, during the next ensuing radio broadcasts of WVU football games, to express contrasting views to those expressed in paid radio advertisements sponsored jointly by the West Virginia Coal Association and the West Virginia Surface Mining and Reclamation Association (the coal associations) and broadcast during WVU football games in the Fall of 1982 over the Mountaineer Sports Network (MSN). In the alternative, the petitioners seek to prohibit future political programming by the respondents. We find that the respondents have a constitutional obligation to present opposing viewpoints to those expressed in the coal associations' advertisements and that the UMWA, as an appropriate spokesman for the presentation of such viewpoints, has the right to respond to the coal associa-

tions' advertisements.[1] Accordingly, we grant the writ.

WVU is a publicly owned and supported land-grant institution of higher education established by the West Virginia Legislature in 1867. *See* 1867 W.Va. Acts ch. 9, ch. 108; *see also* 1863 W.Va. Acts ch. 56. MSN is an arm of the Department of Intercollegiate Athletics at WVU which contracts with advertisers to provide funds for broadcast coverage of WVU athletic events. Respondent Parsons is responsible for the oversight of MSN.

MSN is not a radio broadcaster itself, but rather produces a sports program "package" which it provides through a barter system to individual radio stations for broadcast. As part of its football programming, MSN requires local radio stations to carry 15 minutes of advertising provided by MSN pursuant to agreements with advertisers.[2] The radio "sponsor agreement" executed between MSN and its advertisers includes a right of first refusal whereby it is provided that when MSN determines the advertising rates to be charged in the next season, the advertiser is given the opportunity to purchase the same amount of advertising time purchased in the previous season. Because MSN advertisers typically exercise their right to renew, there is presently a waiting list of prospective advertisers for WVU football broadcasts. The "sponsor agreement" does, however, contain a clause permitting either party to cancel its contractual obligations by giving 30 days notice.

The respondents assert that MSN is not involved in the production of advertisements. Rather, the advertisements are received by MSN as a finished product provided by the advertiser. Although the radio "sponsor agreement" provides that MSN announcers will perform live commercials if so requested, the announcers merely read advertising copy provided by advertisers. Thus, the respondents assert that MSN performs no substantive review prior to broadcast of the content of advertising furnished. We note, however, that the radio "sponsor agreement" expressly reserves to MSN the right to "approve or disapprove ... all commercial copy." The respondents assert that this right has never been exercised by MSN, and exists solely to insure compliance with NCAA obligations and WVU rules which prohibit endorsement of advertisers' products.

The West Virginia Coal Association has been an advertiser on MSN for more than ten years. In the past, its advertisements were essentially commercial in nature and designed to promote the use of coal. During the Fall of 1982, however, the advertisements provided by the coal associations to MSN and broadcast during WVU football games were both political and controversial. Their apparent purpose was to convince legislators and the public that the "business climate" in West Virginia needed improvement.[3] Although recognizing the

---

1. Our disposition on this issue makes it unnecessary to address the petitioners' alternative prayer for relief.

2. Fifty-seven individual radio stations broadcast the 1982 MSN football programs. Local stations were allotted nine minutes of advertising time which they could themselves sell to local advertisers. MSN has determined that 24 minutes total advertising time is the maximum that can reasonably be placed in a football broadcast format. We are not concerned in this proceeding with individual licensees who broadcast MSN programming. Additionally, this case has nothing to do with the ability of West Virginia University to broadcast its football games, which is unquestioned. Finally, we are not concerned with advertising aired over MSN which is not politically oriented.

3. The advertisements provided to MSN in the Fall of 1982 by the coal associations were a part of a broader public communications program. The following news release explains the goals of the program:

NEWS RELEASE—For Immediate Release
September 9, 1982
(Jointly issued by Edwin K. Wiles, president-West Virginia Coal Association, 342–4153 and Ben C. Greene, president-West Virginia Surface Mining & Reclamation Association, 346–5318)
–0–
CHARLESTON—The West Virginia coal industry is launching a new public communications program this week, seeking to address and enlighten West Virginians about the need to improve the overall business climate and attitude in this state so as to expand the economy and provide jobs.

The messages, sponsored jointly by the West Virginia Coal Association and the West Virginia Surface Mining & Reclamation Association, will be carried on the Mountaineer Sports Network broadcasts of WVU football games and on Mountain-Net, the West Virginia Radio Network. Newspaper ads and other communication mediums will follow and other business and industry organizations are expected to join in the program.

The program emphasizes the critical need to improve the business attitude and climate in West Virginia, recognizing that major employers will not invest and expand unless the state is viewed as attractive for such investments. "They've Got to Like It Here" is a theme of the program.

Some of the commercials point to a recent nationwide study—even being advertised by other states in national publications—which rank [sic] West Virginia last in factors which attract business; other messages note the negative impact of court decisions, legislative action and regulatory impositions upon employers in West Virginia that have contributed to economic difficulties and similar concerns for employers in the state.

"While the messages bring focus to what is felt to be a negative situation," spokesmen for the sponsoring organization said, "they convey a positive, constructive encouragement to West Virginians that we need improving change in West Virginia to make our state more attractive to business location and expansion."

Even before the current national economic downturn and its resulting effects, the coal representatives said, the coal industry has been consistently declining in this state and other segments of the job-providing economy have similarly fallen off. For example, over 25,000 solid, high-paying manufacturing jobs have been lost in the state over the past five years and numerous small businesses have fallen by the wayside. Some of those same companies have located or expanded existing facilities in other states.

"Hence, even when the national economy improves," the spokesmen said, "few business leaders in West Virginia feel confident that West Virginia can have an equivalent upturn unless the state's business climate improves."

Among factors cited as contributory to this problem, they say, are numerous state regulatory requirements upon the entire spectrum of business and industry which exceed or duplicate federal standards and/or do not exist in the other states; an ever-present uncertainty about taxes in this state, added to by recent court decisions which seem to mandate enormous tax increases; the advocacy and serious consideration by many legislators of proposals such as ones to require a company to give two years' notice of a closing and face other punitive sanctions; the "Mandolidis" decision of the State Supreme Court which has opened the floodgates of civil suits against employers in workmen's compensation cases; and numerous other such legislative, judicial or regulatory excesses in this state.

The coal organizations said the state's industrial development office is genuinely working hard to bring employers to West Virginia, "but the hard economic facts are that a myriad of anti-business decisions and actions discourage companies."

"We don't think anyone intended for this climate or this attitude to develop and continue to prevail in this state," the spokesmen said. "Nevertheless, it does exist ... and we believe most West Virginians will understand that for new jobs to occur in the state, employers have got to like it here."

–0–0–0–0–0–

*Did you realize?* ...

West Virginia's coal production in 1970 was 144 million tons and through the decade of the 60's it averaged over 140 million tons annually. Since 1970, we have averaged 118.5 million tons and never exceeded 124 million tons in any year (1972).

Kentucky produced 125 million tons in 1970. The past three years, Kentucky has averaged 150 million tons ... and has been the nation's No. 1 producer consistently since 1973.

Since 1970, Pennsylvania has maintained a consistent level of production in the mid-to-high 80 millions of tons. Virginia has grown from 35 million tons in 1970 to 45.5 million tons in 1981.

Obviously, companies investing in coal have in an increasing fashion been by-passing West Virginia to mine elsewhere. Why?

Over the past couple of years companies have cut back operations and furloughed hundreds of workers in West Virginia. At the same time, they have made multi-million-dollar investments and expansions in other states.

The State Supreme Court has, with regularity over the past five years, made decisions on suits involving mine safety laws which contribute absolutely nothing to improved mine safety, but impose unnecessarily costly burdens on West Virginia producers ... when there is no comparable provision in either federal law or those of other states. And, the Legislature has refused to correct these decisions by changes in the law.

####

The coal associations purchased five minutes of advertising time for each of the 11 WVU football games broadcast over MSN. These five minutes were divided into individual 30 and 60 second commercials. The text of one of the 60 second commercials is:

To the people who make our laws in the State of West Virginia. There's a survey going around the country that happens to list our state as absolutely last in the factors that attract and hold the companies we need to provide jobs. That's not something you ever intended, but it sure is something to be concerned about. Times are bad enough and if

political and controversial nature of the coal associations' advertising, MSN determined that it would be "inappropriate to refuse to run advertisements based upon their political content."

Sometime in February or early March, 1983, Michael Burdiss, a representative of the UMWA, telephoned respondent Parsons and requested free advertising time to express a rebuttal to the views expressed by the coal associations in the advertisements broadcast over MSN. Respondent Parsons denied this request. The union representative then inquired whether the UMWA could purchase advertising time. Respondent Parsons also denied this request saying no advertising time was available.[4] Thereafter, the petitioners instituted proceedings in this Court.

we're going to have enough jobs for West Virginians, we're going to have to make our climate for business a lot better than it is. Starting now, we've gotta work on it.

singing: (We've got a job to do)

West Virginia coal brings you this message because we're concerned. Yes, we're the state's largest employer and yes we are greatly affected by this state's business attitude. But just as we want to see jobs returned to the coal industry, we want to see jobs returned everywhere. We need an attitude toward the employers who provide those jobs and there's no getting away from it, they've got to like it here.

singing: (They've got to like it here—West Virginia)"

The respondents concede that the coal associations' advertisements "were both political and controversial." Indeed, coal miner health and safety has long been a profoundly controversial political issue in West Virginia, as is reflected in our literature, see, e.g., L. Dillon, *They Died in Darkness* (1976); H. Lee, *Bloodletting in Appalachia* (1969), in the public record of the toll which profit-motivated operator practices have exacted on the life and limbs of West Virginia miners, see W.Va. Dept. of Mines, *Annual Report and Directory of Mines* (1982) (twenty-two coal miners lost their lives in West Virginia coal mines in 1982 and 4,358 miners suffered lost-time injuries), and in the decisions of this Court. *See, e.g., United Mine Workers of America v. Miller,* 170 W.Va. 177, 291 S.E.2d 673 (1982). Indeed, one of our number has been moved to note:

[I]n this case we are not concerned with a mere point of law in routine civil litigation, but rather with the lives and limbs of countless thousands of living, breathing, human beings who, along with their families, have suffered needless loss since time out of mind in an industry which appears inevitably to suck the life's blood from the miner as he takes the coal from the earth.

*Walls v. Miller,* 162 W.Va. 563, 251 S.E.2d 491, 496 (1978). A cursory review of any coal bibliography reveals a plethora of publications documenting the plight of coal miners and their struggle for a better, safer life. For example, in C. Ross, *Bibliography of Southern Appalachia* (1976) at 67–70, the following titles appear: "The Pittston Mentality: Manslaughter in Buffalo Creek;" "The Mine War on Cabin Creek and Paint Creek, West Virginia, in 1912–1913;" "The New Kanawha River and the Mind War of West Virginia;" "Human Crisis in the Kingdom of Coal;" "Death in the Dark;" "The Hurricane Creek Massacre: An Inquiry into the Circumstances Surrounding the Deaths of Thirty-eight Men in a Coal Mine Explosion;" "Coal: Southwest Virginia's Source of Misery;" "Notable Mine Disasters of Fayette County, West Virginia;" "A Study of Fatal Roof Fall Accidents in Bituminous Coal Mines;" "Coal Creek Rebellion;" "The Coal Miner's Insurrections, 1891–1892;" and "The Plight of the Bituminous Coal Miner." This history of bloodshed gives special meaning to a comment appearing in the public record that, in the context of mining, "one man's good business climate is another man's feudal society." Little, *[Business Climate] Bowl Bid Rumored for Mountaineers,* The Sunday Gazette-Mail (Charleston, W.Va.), Sept. 19, 1982, at 6B, col. 2.

4. In their petition, the UMWA asserts that a request was made for an opportunity to rebut the coal associations' advertisements in or about February, 1983, and that such request was denied by respondent Parsons. In his affidavit, respondent Parsons asserts that he received a telephone call in late February, 1983, from an unidentified source who inquired about various aspects of MSN advertising. (Apparently, respondent Parsons attributes this call to the UMWA.) Parsons states that he received a telephone call in the first week of March, 1983, from Dan Hedges, who, on behalf of UMWA, requested free time to rebut the coal associations' advertisements. Respondent Parsons states that he informed Hedges that such a request should be directed to the individual licensees who carry MSN programs, since MSN is not licensed by the Federal Communications Commission. In response to Hedges' request to purchase time, Parsons, thinking Hedges sought to purchase time for the basketball season then in progress, stated that advertising space had been sold out since August, 1982. Parsons states that he had no further contact with the UMWA or its representatives until he was notified of this proceeding. Michael Burdiss, a representative of the UMWA who claims to have contacted Parsons, states in his affidavit that Parsons did not mention individual licensees, but merely laughed and refused the request for free time. Burdiss states that in response to his inquiry as to whether time could be purchased,

This case is unique in that it presents a novel combination of legal issues. These issues involve similar, though diverse, principles of law which have evolved from our constitutional guarantees of equal protection and free speech. Two of these principles are particularly relevant to this case—the "public forum doctrine" which protects the right of citizens to use certain governmental property for the exercise of free speech, and the "fairness doctrine" which requires that the discussion of public issues be presented on broadcast stations, and that each side of those issues be given fair coverage. Although not controlling under the facts presented, an examination of these principles is essential to understanding the nature of the issues involved.

## I.

In a series of cases, the United States Supreme Court has developed the "public forum doctrine." The doctrine first emerged in *Hague v. CIO*, 307 U.S. 496, 515–16, 59 S.Ct. 954, 964, 83 L.Ed. 1423, 1436–37 (1939), where the Court struck down a city ordinance requiring a permit for public assembly, stating:

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied.

Since *Hague*, the doctrine has become firmly established as an important principle of constitutional law. It prohibits states from regulating speech-related conduct on certain governmental property except through reasonable, nondiscriminatory time, place, and manner regulations. Central to the doctrine is the concept that access to public forums must be provided by government on an equal basis. As was stated in *Police Dept. of the City of Chicago v. Mosley*, 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212, 217 (1972):

> Necessarily, then, under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. And it may not select which issues are worth discussing or debating in public facilities. There is an "equality of status in the field of ideas," and government must afford all points of view an equal opportunity to be heard. Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say. Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone. [footnote omitted]

To determine whether a public forum exists, courts examine several criteria. These include "the character of the place, its usual activities and whether its historical dedication has been to the exercise of First Amendment rights." *Spartacus Youth League v. Board of Trustees of Illinois Industrial University*, 502 F.Supp. 789, 798 (N.D.Ill.1980). Places which have been held by the United States Supreme Court to constitute public forums include: streets, parks, and sidewalks, *Hague, supra;* statehouse grounds, *Edwards v. South Carolina*, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963); a public library, *Brown v. Louisiana*, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966); a military res-

Parsons refused, saying that all time was sold

out, including that to the coal associations.

ervation, *Flower v. United States,* 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972) (per curiam); a municipal theater, *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975); a school board meeting, *City of Madison Joint School District v. Wisconsin Public Employment Relations Comm'n,* 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976); university meeting facilities, *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981); and, public sidewalks forming the perimeter of the United States Supreme Court grounds, *United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983).

Various courts have held that university facilities generally open to the public constitute public forums. In *Widmar v. Vincent,* 454 U.S. at 267–68 n. 5, 102 S.Ct. at 273 n. 5., 70 L.Ed.2d at 446 n. 5, the Supreme Court discussed the application of the public forum doctrine to a public university:

> This Court has recognized that the campus of a public university, at least for its students, possesses many of the characteristics of a public forum. See generally, *Police Dept. v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); *Cox v. Louisiana,* 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1975). "The college classroom with its surrounding environs is peculiarly 'the marketplace of ideas.' " *Healy v. James,* 408 U.S. 169, 180, 92 S.Ct. 2338, 2345, 33 L.Ed.2d 266 (1972). Moreover, the capacity of a group or individual "to participate in the intellectual give and take of campus debate … [would be] limited by denial of access to the customary media for communicating with the administration, faculty members, and other students." *Id.,* at 181–182, 92 S.Ct., at 2346. We therefore have held that students enjoy First Amendment rights of speech and association on the campus, and that the "denial [to particular groups] of use of campus facilities for meetings and other appropriate purposes" must be subjected to the level of scrutiny appropriate to any form of prior restraint. *Id.,* at 181, 92 S.Ct., at 2346, 2347.

Other courts have also applied the public forum doctrine to institutions of higher education. *See, e.g., Jones v. Board of Regents,* 436 F.2d 618 (9th Cir.1971); *Spartacus Youth League, supra; Brubaker v. Moelchert,* 405 F.Supp. 837 (W.D.N.C. 1975); *Dunkel v. Elkins,* 325 F.Supp. 1235 (D.Md.1971).

■ West Virginia University exists as the legislative fulfillment of a constitutional mandate that it "foster and encourage, moral, intellectual, scientific and agricultural improvement [and] wherever it may be practicable, make suitable provision … for the organization of such institutions of learning as the best interests of general education in the State may demand." W.Va. Const. art. XII, § 12. In establishing a board of visitors, predecessor to the Board of Regents, to oversee the operations of what was then called the "Agricultural College of West Virginia," the Legislature made clear that it was the duty of the board to "establish such departments of education in literature, science, art and agriculture, as they may deem expedient, and as the funds under their control may warrant." 1867 W.Va. Acts, ch. 9, § 5.

In creating West Virginia University, the Legislature established what is, practically speaking, a specialized forum. As the United States Supreme Court stated in *Healy v. James,* 408 U.S. at 180, 92 S.Ct. at 2345, 33 L.Ed.2d at 279, "The college classroom with its surrounding environs is particularly 'the marketplace of ideas.' " Thus, a public university can properly be viewed as a governmentally created specialized forum for the propagation of information and knowledge. In *Spartacus Youth League,* 502 F.Supp. at 798, the court stated, "A public university although not created mainly for public interchange, is an important area for a broad range of communicative activities. The college campus is a peculiarly fertile environment for the exchange and dissemination of ideas." Public universities, such as West Virginia University, are enclaves of intellectual pursuit in which a spirit of open-mindedness, free inquiry, and critical evaluation is to be

encouraged and fostered. In *Keyishian v. Board of Regents*, 385 U.S. 589, 603, 87 S.Ct. 675, 683–84, 17 L.Ed.2d 629, 640–41 (1967) (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 250, 77 S.Ct. 1203, 1211–12, 1 L.Ed.2d 1311, 1324 (1957)), the Court stated:

> The Nation's future depends upon leaders trained through wide exposure to [a] robust exchange of ideas .... "The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth .... Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die."

The Supreme Court's observations in *Keyishian* are equally applicable to the crucial role played by institutions of higher education with regard to the social, economic, political, and cultural development of the general public at the state level.

■ The analysis of West Virginia University's status as a specialized forum for the dissemination of ideas does not change because intercollegiate athletics is involved. Similarly, the nature of MSN as a commercial enterprise does not diminish the responsibilities which flow from its relationship to the university. The primary mission of WVU is educational. Intercollegiate athletics are only incidental to this primary mission, and can be justified only to the extent that they serve educational goals. The substantial investment of public funds to create and support an athletic infrastructure which includes a new 20 million dollar football stadium and a new 4.5 million dollar all purpose shell building for sports and physical education at WVU,[5] however, has enabled it to develop by barter[6] a network of radio stations interested in broadcasting its football games. WVU has by the use of this barter system reserved for itself control over the majority of advertising time sold.

There is no indication that any determination was made on the part of WVU that there was an unfulfilled educational need which could be met by the sale of advertising. In *State ex rel. v. Southern Junior College*, 166 Tenn. 535, 539–40, 64 S.W.2d 9, 10 (1933), the Tennessee Supreme Court held that although a state college could operate a printing shop as an educational tool, it could not do so on a commercial basis "since the carrying on of the business of commercial printing had no reasonable relation to the conduct of the school." The authority of WVU to create MSN is not challenged here. However, *Southern Junior College* demonstrates the tenuous nexus between the operation of a commercial enterprise and the educational mission of colleges and universities.

The increased popularity of WVU football presents a profound opportunity for the university to educate members of the public to the value of education. West Virginia ranks 42nd nationally in percentage of population completing at least high school, with only 43.4 percent earning high school diplomas. *U.S. Department of Commerce, Statistical Abstract of the United States 1982–83*, at 144. The State pride generated by the success of WVU football could be utilized to call the public's attention to the value of education, which has preferred constitutional status in this State. W.Va. Const. art. XII, §§ 1 and 12.

The control exercised by WVU over the sale of advertising time is identical to that exercised over any other vehicle of expression within the institution. Therefore, the framework for evaluating whether the advertising time sold by MSN constitutes a public forum is identical. An examination of the character of a university, its usual activities, and its traditional role as an arena for the interchange of ideas, would indicate that WVU is, in fact, a "public" forum. However, previous court decisions involving the application of the public forum doctrine to universities, as well as in other contexts, have been limited to public

---

**5.** *See* W.Va.Code §§ 18–12B–1(6) and (7) (Supp. 1983).

**6.** *See* note 2 *supra* and accompanying text.

places, e.g., classrooms, see *Widmar v. Vincent, supra;* a student union and adjacent walkways, see *Spartacus Youth League;* and other specific buildings or physical areas, *Brubaker, supra; Wood v. Davison,* 351 F.Supp. 543 (N.D.Ga.1972), and *Dunkel, supra.* In contrast, the present case involves intangible property— the sale of advertising time for broadcast during university football games.

Although the public forum doctrine functions well in protecting the right of access when governmental regulation of a *physical facility* is involved, its utility in the broadcasting context is considerably diminished. In *Columbia Broadcasting System, Inc. v. National Democratic Committee,* 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 774 (1974), the United States Supreme Court, in rejecting a right of access to the broadcast media, recognized the limited utility of the public forum doctrine in the broadcast context. The Court stated that its previous public forum decisions "provide little guidance ... in resolving the question whether the First Amendment requires a private right of access to the broadcast media. In none of those cases did the forum sought for expression have an affirmative and independent statutory obligation to provide full and fair coverage of public issues...." 412 U.S. at 129, 93 S.Ct. at 2100, 36 L.Ed.2d at 799. It is the unique nature of broadcasting as an extensively regulated vehicle of communication which gives rise to a constitutional treatment different from other modes of expression.

The broadcast media, like the print media, are protected by constitutional free speech and press guarantees. See *United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 166, 68 S.Ct. 915, 933, 92 L.Ed. 1260, 1297 (1948). In contrast to the print media, however, broadcasters have traditionally been subject to extensive governmental regulation. In *Red Lion Broadcasting Co., Inc. v. FCC,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), the United States Supreme Court chronicled the genesis of federal regulation of broadcasting:

Before 1927, the allocation of frequencies was left entirely to the private sector, and the result was chaos. It quickly became apparent that broadcast frequencies constituted a scarce resource whose use could be regulated and rationalized only by the Government. Without government control, the medium would be of little use because of the cacaphony of competing voices, none of which could be clearly and predictably heard. Consequently, the Federal Radio Commission was established to allocate frequencies among competing applicants in a manner responsive to the public "convenience, interest, or necessity." [footnotes omitted] 395 U.S. at 375–77, 89 S.Ct. at 1799, 23 L.Ed.2d at 380–81.

In 1934, the Federal Radio Commission became the Federal Communications Commission. Communications Act of 1934, Pub.L. No. 73–416, 48 Stat. 1064 (1934) (codified as amended at 47 U.S.C. §§ 151–609 (1976 & Supp. V 1981)). Its mission continued to be the furtherance of the "public interest, convenience, or necessity" with regards to its regulation of broadcasting. See 47 U.S.C. §§ 302a(a); 307(c); 307(e)(1); 309(a); 310(d); 311(b); 311(c)(3); 311(d)(3); 316(a); 317(d); 318, 319(d), 721(c)(7); 721(c)(8); 721(c)(9); 721(c)(10); 734(b)(1) (1976 & Supp. V 1981).

The scarcity theory of broadcasting discussed in *Red Lion, supra,* was first advanced by the Supreme Court in *National Broadcasting Co. v. United States,* 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943). In responding to the first broadcast licensee attack of Federal Communications Commission regulations on constitutional grounds, the Court stated, "Freedom of utterance is abridged to many who wish to use the limited facilities of radio. Unlike other medias [*sic*] of expression, radio inherently is not available to all. That is its unique characteristic, and that is why, unlike other modes of expression, it is subject to governmental regulation." 319 U.S. at 226, 63 S.Ct. at 1014, 87 L.Ed. at 1368. This scarcity rationale has permitted the Federal Communications Commission not only to regulate the technical aspects of broadcasting, but also to set up a regula-

tory scheme to ensure that the content of what is broadcast conforms with the "public interest, convenience, or necessity." This content regulation of broadcasting has become known as the "fairness doctrine."[7]

■ The basic principle underlying the fairness doctrine is the public's right to be informed. The fairness doctrine "imposes two affirmative responsibilities on the broadcaster: coverage of issues of public importance must be adequate and must fairly reflect differing viewpoints." *Columbia Broadcasting System*, 412 U.S. at 111, 93 S.Ct. at 2090, 36 L.Ed.2d at 788. The fairness doctrine is triggered when a broadcaster has presented only one side of a controversial issue of public importance. *Green v. FCC*, 447 F.2d 323 (D.C.Cir.1971). A complainant who invokes the fairness doctrine must show unfairness and imbalance in the broadcaster's treatment of the particular issue. *Healy v. FCC*, 460 F.2d 917 (D.C.Cir.1972). If the complainant prevails the FCC advises the licensee "to meet its fairness obligations through additional programming." *In the Matter of the Handling of Public Issues Under the Fairness Doctrine and the Public Interest Standards of the Communications Act.* 48 F.C.C.2d 1, 17 (1974) [hereinafter *Fairness Report*]. The Federal Communications Commission in a report on its application of the fairness doctrine has stated:

> [T]he Commission's first task in handling a typical fairness complaint is to review the licensee's determination as to whether the issue specified in the complaint or the Commission's inquiry has actually been raised in the licensee's program-

ming. Secondly, we must review the licensee's determination of whether that issue is "controversial" and of "public importance." If these questions are answered in the affirmative, either by admission of the licensee or by our determination upon review, we must then determine whether the licensee has afforded a "reasonable opportunity" in his overall programming for the presentation of contrasting points of view.

48 F.C.C.2d at 13.

■ In an amicus brief filed by the coal associations, their primary contention is that the subject matter of the UMWA's petition is preempted by the Communications Act of 1934. This contention ignores the fact that MSN is not a licensee subject to federal jurisdiction. Rather, MSN merely produces programming which it sells to licensees. Although the concepts underlying the fairness doctrine as developed by the Federal Communications Commission provide some guidance in our examination of MSN's responsibility to afford a reasonable opportunity for the presentation of contrasting viewpoints, federal communications regulations do not control.

## II.

The petitioners base their claim for relief upon two provisions of the West Virginia Constitution derived from the Virginia Bill of Rights. *See* Va. Const. art. I, §§ 3, 12.[8] The first, W.Va. Const. art. III, § 3, provides that "[g]overnment is instituted for the common benefit, protection and security of the people...."[9] The second, W.Va.

7. Although founded in the "public interest, convenience, or necessity" requirement of 47 U.S.C. § 315, the fairness doctrine is a "common-law development," in that it has evolved from a long line of rulings by the F.C.C. on a case by case basis. *Brandywine-Main Line Radio, Inc. v. F.C.C.*, 473 F.2d 16, 38–39 (D.C.Cir.1972). *See In the Matter of Editorializing by Broadcast Licensees*, 13 F.C.C. 1246 (1949).

8. In their petition the UMWA contends that the respondents are also in violation of W.Va.Code § 18–24–1 *et seq.*, statutory provisions dealing with fees and other money collected at state institutions of higher education. However, the petitioners do not argue the merits of this con-

tention in their note of argument. Thus, we address only their constitutional claims.

9. W.Va. Const. art. III, § 3 provides in its entirety:

> Government is instituted for the common benefit, protection and security of the people, nation or community. Of all its various forms that is the best, which is capable of producing the greatest degree of happiness and safety, and is most effectually secured against the danger of maladministration; and when any government shall be found inadequate or contrary to these purposes, a majority of the community has an inalienable, and indefeasible right to reform, alter or abolish it

Const. art. III, § 7, prohibits the passage of any law abridging freedom of speech.[10] The petitioners argue that by providing a forum to the coal associations to air their views on a controversial issue to the exclusion of others who wish to present a contrasting viewpoint, the respondents have violated these constitutional provisions. The respondents, on the other hand, contend that they have not acted unconstitutionally in the sale of advertising time to the coal associations, and that the relief requested by the UMWA would itself violate the first amendment to the United States Constitution.

■■■ The obligation upon broadcasters under the Communications Act of 1934, 47 U.S.C. §§ 151 *et seq.* to operate in the "public interest" is analogous to the obligation imposed upon state government by the West Virginia Constitution to act "for the common benefit, protection and security of the people." W.Va. Const. art. III, § 3. The obligation upon state government, however, to preserve its neutrality when it provides a vehicle for political expression is even greater. The West Virginia's "common benefit, protection and security" provision is an equal protection clause. It is as applicable in the marketplace of ideas as it is in any other context. The guarantee of equal protection of the laws has been characterized as "[a] natural doctrinal vehicle for promoting the principle of equal liberty of expression." Kalven, *Equality as a Central Principle in the First Amendment,* U.Chi.L.Rev. 20, 20 (1975). By requiring governmental neutrality in the field of ideas and the balanced presentation of opposing points of view in governmentally created forums, our state constitution's "common benefit" provision serves important equal protection objectives that federal communications law has not been interpreted to serve. One of these objectives is fundamental fairness, a concept which is inherent to equal protec-

tion. Accordingly, we conclude that when a state agency or instrumentality sells advertising for broadcast which presents one side of a politically controversial issue of public concern, it is obligated under W.Va. Const. art. III, § 3 and art. III, § 7 to preserve its neutrality by providing a reasonable opportunity for the presentation of contrasting points of view in order that the "common benefit, protection and security" be served and fundamental fairness preserved.

■■■ In addition to the equal protection principles served by the requirement of governmental neutrality, a more enlightened discussion of important public issues is also fostered. The obligation of the State in cases such as this must be considered against "the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open." *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686, 701 (1914). The United States Supreme Court has recognized that freedom of expression concerning public issues "is at the heart of the First Amendment's protection." *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 776, 98 S.Ct. 1407, 1415, 55 L.Ed.2d 707, 717 (1978); *see also Mills v. Alabama,* 384 U.S. 214, 218, 86 S.Ct. 1434, 1436, 16 L.Ed.2d 484, 488 (1966); *Garrison v. Louisiana,* 379 U.S. 64, 74–75, 85 S.Ct. 209, 215–16, 13 L.Ed.2d 125, 133 (1964) ("speech concerning public affairs is more than self-expression; it is the essence of self-government"). When those in power suppress competing views on public issues, self-government is trammeled. *Bellotti,* 435 U.S. at 777 n. 12, 98 S.Ct. at 1416 n. 12, 55 L.Ed.2d at 718 n. 12. This recognition of the dynamic nature of the marketplace of ideas has resulted in an increased appreciation of the first amendment rights of the recipients of information. *See Martin v.*

---

in such manner as shall be judged most conducive to the public weal.

**10.** W.Va. Const. art. III, § 7 provides:
No law abridging the freedom of speech, or of the press, shall be passed; but the legislature may by suitable penalties, restrain the

publication or sale of obscene books, papers, or pictures, and provide for the punishment of libel, and defamation of character, and for the recovery, in civil actions, by the aggrieved party, of suitable damages for such libel, or defamation.

*City of Struthers,* 319 U.S. 141, 143, 63 S.Ct. 862, 863, 87 L.Ed. 1313, 1316–17 (1943); *Thomas v. Collins,* 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945); *Lamont v. Postmaster General,* 381 U.S. 301, 308, 85 S.Ct. 1493, 1497, 14 L.Ed.2d 398, 403 (1965) (Brennan, J., concurring); *Griswold v. Connecticut,* 381 U.S. 479, 482, 85 S.Ct. 1678, 1680, 14 L.Ed.2d 510, 514 (1965); *see also Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969). As the United States Supreme Court stated in *Red Lion,* 395 U.S. at 390, 89 S.Ct. at 1806–07, 23 L.Ed.2d at 389:

> It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than to countenance monopolization of that market, whether it be by the government itself or a private licensee .... It is the right of the public to receive suitable access to social, political, esthetic, moral and other ideas and experiences which is crucial here. [footnotes omitted]

Requiring MSN to provide a reasonable opportunity for the balanced presentation of contrasting points of view will provide a more enlightened debate on the public issues discussed in the coal associations' advertisements, and will preserve the right of

the listening audience to receive access to diverse ideas.

 The respondents contend that, under the first amendment, they cannot exercise any content review over the advertisements submitted for broadcast. Although not essential to the disposition of the present case, the Court notes that content review has been permitted in certain limited contexts. For example, in *Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), the Supreme Court upheld a municipality's rule which prohibited political candidates from placing advertisements on placards inside rapid transit vehicles,[11] stating:

> The city consciously has limited access to its transit system advertising space in order to minimize chances of abuse, the appearance of favoritism, and the risk of imposing upon a captive audience. These are reasonable legislative objectives advanced by the city in a proprietary capacity. In these circumstances, there is no First or Fourteenth Amendment violation.

418 U.S. at 305, 94 S.Ct. at 2718, 41 L.Ed.2d at 778.[12]

The sale of advertising by MSN, an instrumentality of the State, presents the

---

**11.** The Court's conclusion in *Lehman* that a governmental entity could choose to prohibit certain categories of speech in limited contexts was foreshadowed by its decision in *Columbia Broadcasting System,* 412 U.S. at 412, 93 S.Ct. at 2096, 36 L.Ed.2d at 794, where it held that even "assuming governmental action," neither the first amendment nor the Communications Act of 1934 was violated by a broadcaster's refusal to accept editorial advertisements. Exceptions to the first amendment principle that time, place, and manner regulations affecting protected expression must be content-neutral have also been recognized in other contexts. *See, e.g., Young v. American Mini Theaters, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (upholding a zoning ordinance which restricted the locations of new theaters showing sexually explicit "adult" movies); *Rowan v. Post Office Department,* 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970) (upholding a law which provided that addressees who received "a pandering advertisement" in the mail which they deemed offensive could obtain the removal of their names from the advertiser's mailing list); *Ginsberg v. New York,* 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968) (affirming conviction for selling to a minor magazines which were "not obscene" if shown to adults).

**12.** The petitioners rely upon *Lehman* as support for their alternative prayer for relief to prohibit political advertising by the coal associations over MSN. Our disposition of the issues in this case renders unnecessary a discussion of this issue. However, the thesis of *Lehman* is complicated in West Virginia by our constitutional provision which guarantees the right of the people to petition the government for the redress of grievances. *See* W.Va. Const. art. III, § 16. Moreover, *Lehman* has been uniformly criticized for its unorthodox equal protection analysis. *See, e.g.,* Note, *Access to State-Owned Communication Media-The Public Forum Doctrine,* 26 UCLA L.Rev. 1410, 1418 n. 29 (1979); Comment, *The Supreme Court, 1973 Term,* 88 Harv. L.Rev. 41, 154 (1974); Note, *The Public Forum: Minimum Access, Equal Access, and the First Amendment,* 28 Stan.L.Rev. 117, 118 (1975). Accordingly, we wish to emphasize that a different result could obtain under the West Virginia Constitution under similar facts to those presented the United States Supreme Court in *Lehman.*

same dangers addressed by the Supreme Court in *Lehman*. First, there is a substantial potential for abuse present in the contractual arrangement that exists between MSN and its advertisers. By giving a right of first refusal to its advertisers, MSN encourages the monopolization of the special forum it has created, and effectively prevents the expression of new ideas and viewpoints.[13] Second, unsophisticated members of the public who are unaware of the intricacies of MSN's relationship with its advertisers could easily reach the conclusion that advertisements broadcast over MSN during West Virginia University football games reflect the views of West Virginia University.[14] Finally, the practical limitations of avoiding advertisements over radio could subject unwilling listeners to "the blare of political propaganda" which the Supreme Court has held members of the public have a right to avoid. *Lehman*, 418 U.S. at 304, 94 S.Ct. at 2718, 41 L.Ed.2d at 778; *see also* 418 U.S. at 307, 94 S.Ct. at 2719, 41 L.Ed.2d at 779 (Douglas, J., concurring) ("the right of the commuters to be free from forced intrusions on their privacy precludes the city from transforming its vehicles of public transportation into forums for the dissemination of ideas upon this captive audience.").

The nature of the broadcasting audience as "captive" has been recognized. In *Columbia Broadcasting System*, 412 U.S. at 127, 93 S.Ct. at 2099, 36 L.Ed.2d at 798, the Court stated: "The [Federal Communications] Commission is ... entitled to take into account the reality that in a very real sense listeners and viewers constitute a 'captive audience.'" The Court also quot-

**13.** In addition to the monopolization effect resulting from the right of first refusal provision, the marketing approach adopted by MSN is weighed heavily in favor of the financially affluent, or those with access to wealth. Although advertising time is not sold to the highest bidder, the threshold requirement in terms of cost is beyond the reach of most individuals. The basic advertising rate charged by MSN was $4,000 per minute. The coal associations paid $20,000 for five minutes of advertising to be broadcast during each of the eleven football games.

In rejecting a contention that broadcasters are required to accept editorial advertisements under the Communications Act of 1934 or under the first amendment, the United States Supreme Court in *Columbia Broadcasting System*, 412 U.S. at 123, 93 S.Ct. at 2097, 36 L.Ed.2d at 795, stated, "a right of access ... would have little meaning to those who could not afford to purchase time in the first instance." Similar concerns surfaced in *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). There, in a 5–4 decision, the Supreme Court held that a state statute making it unlawful for a corporation to contribute funds or other valuable assistance to campaigns for or against any election issue or candidate was an unconstitutional violation of the first and fourteenth amendments. All of the opinions in *Bellotti* recognized the potential for domination of the marketplace of ideas posed by corporate wealth. Although Justice Powell's majority opinion rejected the contention that corporate participation in the referendum vote involved would exert an undue influence on the outcome by drowning out other points of view, he recognized that:

If [these] arguments were supported by a record or legislative findings that corporate advocacy threatened imminently to under-

mine democratic process, thereby denigrating rather than serving First Amendment interests, these arguments would merit our consideration.

435 U.S. at 789–90, 98 S.Ct. at 1422–23, 55 L.Ed.2d at 726 (footnotes and citations omitted). *See also* 435 U.S. at 796–77, 98 S.Ct. at 1426–27, 55 L.Ed.2d at 730–31 (Burger, C.J., concurring) (discussing the "vast wealth and power" of media conglomerates); 435 U.S. at 809–12, 98 S.Ct. at 1433–34, 55 L.Ed.2d at 738–40 (White, J., dissenting) (discussing corporate domination of the political process); 435 U.S. at 825–28, 98 S.Ct. at 1441–43, 55 L.Ed.2d at 748–49 (Rehnquist, J., dissenting) (expressing the view that corporations do not have a constitutionally protected liberty to engage in political activity with regard to matters having no material effect on their business).

**14.** Several features of the contractual agreement between MSN and its advertisers could contribute to this public confusion. First, MSN agreed to promote its advertisers in MSN programming and advertising. Second, MSN agreed to recognize each advertiser in each game program and on the stadium scoreboard's message center. Third, the advertisers were authorized to use the name "West Virginia University" or any abbreviation or nickname associated with the university in its promotional efforts in connection with its agreement with MSN. Finally, MSN agreed that its announcers would provide live commercials for its advertisers at no additional cost. Each of these contractual provisions could create a situation whereby state employees or instrumentalities would be actively involved in endorsing the political views of the coal associations.

ed Judge Bazelon's statement in *Banzhaf v. FCC*, 405 F.2d 1082, 1100–01 (D.C.Cir. 1968), *cert. denied*, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969), where the Federal Communications Commission's power to promulgate rules regarding cigarette advertising was upheld:

> Written messages are not communicated unless they are read, and reading requires an affirmative act. Broadcast messages, in contrast, are 'in the air.' In an age of omnipresent radio, there scarcely breathes a citizen who does not know some part of a leading cigarette jingle by heart. Similarly, an ordinary habitual television watcher can *avoid* these commercials only by frequently leaving the room, changing the channel, or doing some other such affirmative act. It is difficult to calculate the subliminal impact of this pervasive propaganda, which may be heard even if not listened to, but it may reasonably be thought greater than the impact of the written word.

412 U.S. at 128, 93 S.Ct. at 2099, 36 L.Ed.2d at 798. Similarly, in *FCC v. Pacifica Foundation*, 438 U.S. 726, 748, 98 S.Ct. 3026, 3040, 57 L.Ed.2d 1073, 1093 (1978), the Supreme Court stressed the privacy aspect of broadcasting as one justification for its special first amendment treatment, stating:

> The broadcast media have established a uniquely pervasive presence in the lives of all Americans.... Material presented over the airwaves confronts the citizen, not only in public, but also in the privacy of the home, where the individual's right to be left alone plainly outweighs the First Amendment rights of an intruder. *Rowan v. Post Office Dept.*, 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970).

Justice Douglas, the crucial fifth vote in *Lehman*, based his decision on the fact that commuters on a mass transit system are a captive audience. To illustrate this position, he stated: "The radio can be turned off, but not so the billboard on streetcar placard." 418 U.S. at 308, 94 S.Ct. at 2719, 41 L.Ed.2d at 780, *quoting*, *Packer Corp. v. Utah*, 285 U.S. 105, 110, 52 S.Ct. 273, 274, 76 L.Ed. 643, 647. How-

ever, it is clear that Justice Douglas had offensive radio *programming*, and not offensive radio *advertising* broadcast during an otherwise inoffensive program in mind. As Justice Douglas stated: "One who tunes in on an offensive *program* at home can turn it off or tune in another station, as he wishes." *Id.* (quoting his dissent in *Public Utilities Comm'n v. Pollak*, 343 U.S. 451, 469, 72 S.Ct. 813, 824, 96 L.Ed. 1068, 1081 (1952) (emphasis added). In this case, however, WVU football fans who wish to avoid the coal associations' advertisements could do so "only by frequently leaving the room, changing the channel, or doing some other such affirmative act." 405 F.2d at 1101.

The respondents assert that the relief requested by the petitioners would impose an unconstitutional burden on their own first amendment rights. They rely upon *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) to support this contention. In *Miami Herald*, 418 U.S. at 258, 94 S.Ct. at 2840, 41 L.Ed.2d at 741, the Supreme Court held that a Florida statute requiring newspapers to afford free space to candidates whose character had been attacked by those newspapers was an unconstitutional violation of the first amendment's free press guarantee. Respondents allege that the imposition of a similar right to reply requirement in this case would be unconstitutional. We disagree.

In *Miami Herald*, the newspaper involved printed editorials critical of Tornillo's candidacy for state legislature. In response, Tornillo demanded that the newspaper print verbatim his replies, relying on a state statute which provided that if a candidate was attacked regarding his personal character or official record by any newspaper, the candidate had a right to demand that the newspaper print, free of charge, any reply the candidate might wish to make to the newspaper's charges. 418 U.S. at 243–44, 94 S.Ct. at 2832–33, 41 L.Ed.2d at 733. The Supreme Court upheld the newspaper's refusal to print Tornillo's reply, relying primarily upon the newspaper's freedom of the press. It stated,

A newspaper is more than a passive receptacle or conduit for news, comment, and advertising. The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and the treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment.

418 U.S. at 258, 94 S.Ct. at 2840, 41 L.Ed.2d at 741. Thus, the newspaper in *Miami Herald* could not be penalized for the exercise of its free speech rights in the same way that any other speaker could not be penalized.

The Mountaineer Sports Network, on the other hand, exercises no editorial judgment over the advertisements it broadcasts. Indeed, respondents concede that MSN is merely a conduit for the views of its advertisers. MSN is no more than a special state revenue account within the Department of Intercollegiate Athletics at WVU. It has no employees or staff. It is not a private entity seeking to advocate its own political views, and therefore, it has no free speech interests similar to those held by the newspaper in *Miami Herald*.

The holding in *Miami Herald* was clearly limited to the print media and the traditional protections that have been afforded the press under the first amendment. These protections do not extend to MSN. Although not a broadcaster itself, MSN is involved in broadcasting, an area which, since its inception, has been subject to extensive governmental regulation, and which has received more limited first amendment editorial protection. As the Supreme Court stated in *Pacifica Foundation*, 438 U.S. at 748, 98 S.Ct. at 3039–40, 57 L.Ed.2d at 1092–93,

> We have long recognized that each medium of expression presents special First Amendment problems.... And of all

forms of communication, it is broadcasting that has received the most limited First Amendment protection. Thus, although other speakers cannot be licensed except under laws that carefully define and narrow official discretion, a broadcaster may be deprived of his license and his forum if the Commission decides that such an action would serve "the public interest, convenience, and necessity." Similarly, although the First Amendment protects newspaper publishers from being required to print the replies of those whom they criticize, *Miami Herald* ..., it affords no such protection to broadcasting; on the contrary, they must give free time to the victims of their criticism. *Red Lion* .... [footnote and citations omitted]

Additionally, unlike the private character of the newspaper in *Miami Herald*, here a public university is involved. Accordingly, we reject the respondents' contention that the relief requested would be unconstitutional under *Miami Herald*.

### III.

We now reach the question of the method by which MSN can fulfill its constitutional obligation to provide an opportunity for the presentation of contrasting views on the controversial issues of public importance raised in the coal associations' advertisements. Although licensees are required under the fairness doctrine to afford a reasonable opportunity for the presentation of contrasting points of view, they are given "considerable discretion in selecting the manner of coverage, the appropriate spokesmen, and the techniques of production and presentation." *Fairness Report*, 48 F.C.C.2d at 16.[15] This flexible approach to the implementation of the fairness doctrine flows from the recognition that fairness issues arise in a myriad of factual situations. Additionally, the broad nature

---

**15.** As the FCC stated in *Mid-Florida Television Corp.*, 40 F.C.C. 620, 621 (1964):

> The mechanics of achieving fairness will necessarily vary with the circumstances, and it is within the discretion of each licensee, acting in good faith, to choose an appropriate method of implementing the policy to aid and encourage expression of contrasting viewpoints. Our experience indicates that licensees have chosen a variety of methods, and often combinations of various methods. Thus, some licensees, where they know or have reason to believe that a responsible individual or group within the community holds a contrasting viewpoint with respect to a controversial issue presented or to be presented, communicate to such an individual or group a specific offer of the use of their facilities for

of the "public interest" requirement which forms the basis for the fairness doctrine necessitates an equally broad method of implementation. *See generally Fairness Report, supra.* Although the fairness doctrine as developed by the FCC is not binding authority, we look to the federal law and experience for guidance in interpreting the obligation of MSN under W.Va. Const. art. III, §§ 3, 7.

Under the approach adopted by the FCC, while "no particular individual has a guaranteed *right* of access to the broadcast microphone for his own self expression, the public as a whole does retain its 'paramount' right 'to *receive* suitable access to social, political, esthetic, moral, and other ideas and experiences....' " *Fairness Report, supra* at 30 (quoting *Red Lion Broadcasting Co. v. FCC,* 395 U.S. at 390, 89 S.Ct. at 1807, 23 L.Ed.2d at 389) (emphasis in original). Therefore, no particular individual or group can appoint itself spokesman for the expression of an opposing point of view:

> The broadcaster is not obliged to permit any particular person to present the "other side" of the controversial issue; if 10 persons ask for the right to speak in opposition, the broadcaster may select only one of them, and he may in fact reject all of them and seek another speaker so long as he acts in good faith. The presentation of a view conflicting with that expressed by the broadcaster may be arranged for by the broadcaster, who may seek out someone to present the conflicting view, and he has considerable discretion in the matter so long as the balance in format, time, and protagonists meets the test of reasonableness.

74 Am.Jur.2d *Telecommunications* § 154 (1974) (footnotes omitted).

█ Where a program has been broadcast presenting one side of a controversial issue, the broadcaster has an affirmative duty to make "a diligent, good-faith effort to communicate to ... potential spokesmen [for opposing points of view] his willing-

ness to present their views on the issue or issues presented." *Fairness Report,* 48 F.C.C.2d at 14. Moreover, where an otherwise appropriate spokesman steps forward, the broadcaster cannot reject the presentation of the opposing viewpoint on the ground that he cannot obtain paid sponsorship. *Cullman Broadcasting Co., Inc.,* 40 F.C.C. 576 (1963); *see also John J. Dempsey,* 6 P & F Radio Reg. 615 (1950); *Metropolitan Broadcasting Corp.,* 19 P & F Radio Reg. 602 (1960); *The Evening News Assn.,* 6 P & F Radio Reg. 283 (1950).

█ The petitioners request an opportunity to express contrasting views to those expressed in the political advertising of the coal associations. Respondents may not rely on either the right of first refusal or other contractual provisions to circumvent its obligation to present contrasting viewpoints. Although it is normally within a state agency's discretion to determine the appropriate spokesmen for the presentation of opposing viewpoints, it must, under the standards of reasonableness and good faith, consider legitimate requests by those wishing to express opposing views. Furthermore, although a state agency may consider ability to pay in determining the amount to be charged for the access provided, access may not turn on the financial capacity of potential spokesmen to pay the rates normally charged. Thus, in a proper case, access may be required to be provided either at a reduced rate or at no charge. Finally, while the amount of time provided for response need not be equivalent to that provided proponents of the initial point of view, it must be sufficient to ensure a reasonably balanced presentation of differing viewpoints in order to preserve the right of the people to hear diverse points of view in state-sponsored forums. We note in this regard that, in the context of state broadcast activities, the amount of time provided to proponents and opponents is perhaps the sole objective criterion for

the expression of contrasting opinion, and send a copy or summary of material broadcast on the issue. Other licensees consult with community leaders as to who might be an appropriate individual or group for such a purpose. Still others announce at the begin-

ning or ending (or both) of programs presenting opinions on controversial issues that opportunity will be made available for the expression of contrasting views upon request by responsible representatives of such views. (quoted in *Fairness Report,* 48 F.C.C.2d at 14)

measuring the balanced presentation of opposing views. Therefore, the amount of time provided for response is an important factor in determining whether a balanced presentation has taken place.

Under the fairness doctrine as developed by the FCC, it would ordinarily be within a licensee's discretion to determine the most appropriate spokesman to respond to a controversial issue of public importance. However, several factors militate against allowing respondents to exercise such discretion in this case. First, respondents failed to seek out respondents to the coal associations' advertisements despite its knowledge of the politically controversial character of the advertisements. Second, despite the UMWA's request for an opportunity to respond, respondents neither afforded it access nor attempted to contact another spokesman. Third, it is apparent from the record that no other person or group has requested that an opportunity to respond be provided. Finally, the UMWA has demonstrated its direct interest in presenting its opposing views through its willingness to litigate the important issues addressed in this case.[16] Indeed, given the composition and extent of the UMWA's constituency,[17] and the

UMWA's express interest in addressing the coal associations' stand on safety regulation and similar matters,[18] it would be deemed an abuse of discretion for MSN to deny the UMWA access for the presentation of its viewpoint [in the event that political advertising by the coal associations again appears on MSN]. Consequently, under the facts of this case, we conclude that the UMWA has a right to respond to the coal associations' advertisements [in the event that political advertising by the coal associations again appears on MSN. Finally, in order that the respondents may fulfill in the future the constitutional obligation to provide access to appropriate spokesmen who wish to present opposing viewpoints to those expressed in politically controversial advertising broadcast over MSN, we further order that the respondents promulgate standards pursuant to the authority granted by W.Va.Code § 18–26–8 (Cum.Supp.1983) to be used in evaluating requests for response time. *Cf. Toward A Gayer Bicentennial Committee v. Rhode Island Bicentennial Foundation*, 417 F.Supp. 632 (D.R.I.1976).].[19]

Writ [as moulded] granted.

16. Under the Communications Act of 1934, broadcast licensees have regularly afforded an opportunity to respond to organizations requesting such an opportunity. *See, e.g., Council for Employment and Economic Energy Use v. FCC*, 575 F.2d 311, 314–15 (1st Cir.1978); *Anti-Defamation League v. FCC*, 403 F.2d 169, 170 (D.C. Cir.1968), *cert. denied*, 394 U.S. 930, 89 S.Ct. 1190, 22 L.Ed.2d 459 (1969).

17. The UMWA represents approximately 280,000 mine workers. *See* 1 *Encyclopedia of Associations* 1414 (1983).

18. The UMWA's earnest concern with mine safety regulation is demonstrated by its participation in litigation to compel compliance with state mine health and safety laws. *See, e.g., United Mine Workers of America v. Miller*, 170 W.Va. 177, 291 S.E.2d 673 (1982); *Walls v. Miller*, 162 W.Va. 563, 251 S.E.2d 491 (1978). *See also Perry v. Barker*, 169 W.Va. 531, 289 S.E.2d 423 (1982).

19. The bracketed language was added to the opinion for a majority of the Court, who, for

unexplained reasons, believe that relief should be provided prospectively only. They ignore the fact that prospective relief is no relief for these petitioners. The limitation of the relief given in this case has created an internal inconsistency which must be addressed. In this case, probably more so than in most opinions, the reasoning and relief are inextricably intertwined. The majority has severed the relief, and moulded in legislative fashion, its own remedy, which is inconsistent not only with the reasoning and logic of the case, but more importantly, with fundamental constitutional principles. When MSN failed to provide an opportunity for the presentation of opposing points of view, a void was created, and the State's imprimatur was placed upon the coal associations' political views. That void can only be filled by more speech. Justices Harshbarger and McGraw believe that the petitioners have clearly established, under law, their right in mandamus to respond in the next ensuing football broadcast season to the politically controversial advertisements of the coal associations which were broadcast over MSN in 1982.